2007 UT 89

**STATE of Utah, Plaintiff and Appellee,**

v.

**Trovon Donta ROSS, Defendant and Appellant.**

No. 20041073.

Supreme Court of Utah.

Nov. 2, 2007.

Mark L. Shurtleff, Att'y Gen., Matthew D. Bates, Asst. Att'y Gen., Salt Lake City, Ste-

ven V. Major, William McGuire, Farmington, for plaintiff.

Elizabeth Hunt, Salt Lake City, for defendant.

NEHRING, Justice:

¶ 1 Early on the morning of June 30, 2003, Trovon Ross arrived at the front door of the home of his ex-girlfriend, Annie Christensen. He carried a loaded gun. Mr. Ross entered the home, and after an exchange of words with his ex-girlfriend and her current boyfriend, James May, Mr. Ross forced Ms. Christensen into a bedroom where he shot her three times, killing her.

¶ 2 Mr. May made an attempt to flee in an automobile parked in the garage. But after being intercepted by Mr. Ross, Mr. May exited the car and took flight on foot. Mr. Ross chased him out of the garage and down the street, firing six shots at him. One shot struck Mr. May, wounding him.

¶ 3 Mr. Ross was apprehended following a chase. He was charged and convicted of aggravated murder and attempted aggravated murder. At Mr. Ross's trial, the sole issue in contention was whether he should be convicted of murder or aggravated murder. Mr. Ross now challenges his conviction on the basis of four claims of error, only the first of which was preserved at the trial court level. First, Mr. Ross alleges he was convicted under an unconstitutional statute—Utah Code section 76-5-202(1)(b) (2003). Second, Mr. Ross contends that his attempted aggravated murder conviction should merge with his aggravated murder conviction. Third, Mr. Ross asserts that the impaneling of an anonymous jury was unfairly prejudicial. And fourth, Mr. Ross believes the State committed prosecutorial misconduct during closing arguments, which affected the outcome of the case, requiring a new trial. We reject Mr. Ross's first, third, and fourth claims; however, the majority finds that the aggravated murder and attempted aggravated murder charges should merge and that the attempted aggravated murder conviction should be vacated.

## BACKGROUND

¶ 4 Mr. Ross knocked on Ms. Christensen's door in Clinton, Utah, at approximately 6:10 a.m. on June 30, 2003. Ms. Christensen answered the door and let him in the house. Mr. Ross waited in the front room while Ms. Christensen went to her bedroom and returned with her boyfriend, Mr. May.

¶ 5 Mr. Ross began to interrogate Ms. Christensen about her relationship with Mr. May, asking intimate questions about their sexual activity. When Ms. Christensen did not respond to Mr. Ross's questions, he pulled a gun from his waistline and put the questions to Ms. Christensen again. Ms. Christensen repeatedly asked Mr. Ross to leave, but he would not do so until she answered his questions.

¶ 6 Mr. Ross then asked Mr. May, "Do you have any family here?" Mr. May did not answer, and Mr. Ross responded, "I can't let her hurt you like she hurt me." Mr. Ross then grabbed Ms. Christensen, pointed the gun at her, and pushed her past Mr. May toward the bedroom. Mr. May believed Mr. Ross was going to kill both Ms. Christensen and him and, apparently in an effort to dissuade Mr. Ross from following through with his plan, told Mr. Ross that the Air Force would be looking for him. Unimpressed, Mr. Ross pushed past Mr. May and took Ms. Christensen to the bedroom.

¶ 7 Mr. May fled to the garage and entered his car. Soon thereafter, he heard a gunshot, a pause, then two more gunshots. Mr. May's car was equipped with an ignition interlock device, requiring him to blow into a breathalyzer to demonstrate that he was not intoxicated before his car would start. He blew into the breathalyzer, but because his breathing was "too erratic," the breathalyzer would not permit ignition.

¶ 8 Mr. Ross then appeared in the doorway to the garage. Mr. May threw his keys out of the car, fled the garage, and began to run down the street. Mr. Ross followed, firing six shots. The second shot went through Mr. May's right arm and into his chest, lodging itself under the skin in front of his ribs.

¶ 9 Still able to run despite his wound, Mr. May ran from house to house searching for

assistance. He finally managed to stop a car in the street, and the driver called the police. An off-duty officer arrived, and Mr. May told him that Ms. Christensen had been shot and directed the officer to her house.

¶ 10 At least two of Ms. Christensen's neighbors heard the gunfire and saw a white van back quickly out of her driveway, hitting a mailbox before speeding off. The neighbors called 911 and reported the shots and the van's description. Clinton City police arrived at Ms. Christensen's house within minutes of the shooting and found her dead on the floor of her bedroom. An examination of her body revealed three gunshot wounds: one to the back right side of the head, one to the neck, and one to the abdomen.

¶ 11 Meanwhile, at 6:20 that morning, Mr. Ross called Steven Christensen, Ms. Christensen's father. Mr. Ross informed Mr. Christensen that he had just killed his daughter and was "on [his] way to [Mr. Christensen's] home to finish the job."

¶ 12 Several Clearfield City police officers heard the broadcast of the van's description and headed toward the area of the shooting. They passed the van en route, turned around, and activated their lights and sirens, but Mr. Ross would not pull over. The police eventually cornered Mr. Ross in a cul-de-sac of a residential area and, after a brief foot chase, arrested him.

¶ 13 The State charged Mr. Ross with aggravated murder, attempted aggravated murder, and failure to obey an officer's signal to stop. Mr. Ross was tried before a jury in November 2004. At trial, Mr. Ross did not contest his participation in the crimes, but rather limited his efforts to persuading the jury that he was not guilty of aggravated murder. Mr. Ross contended that the killing of Ms. Christensen and the shooting of Mr. May were not "committed incident to one act, scheme, course of conduct, or criminal episode" under Utah Code section 76–5–202(1)(b) and thus did not amount to aggravated murder.

¶ 14 Concerned that the case might "generate substantial public interest and media attention," the trial court impaneled an anonymous jury "to protect the identity and privacy of the jurors[ ] and to protect jurors, witnesses, and parties from unnecessary commotion, confusion, or influence." The court sought to preserve the jurors' anonymity by assigning each of them a number by which they were identified during the trial. The court informed jurors on more than one occasion—both verbally in the trial court proceedings and on the jury questionnaire that each prospective juror completed—that the use of numbers was to protect their privacy and to encourage jurors' candor during the voir dire process. With one exception, each prospective juror was addressed by both name and number during in-chamber interviews conducted during the course of jury selection. In four different interviews, defense counsel referred to prospective jurors by name, and the State did so three times.

¶ 15 After a three-day trial, the jury convicted Mr. Ross of aggravated murder and all other charges. Mr. Ross waived his right to a jury in the penalty phase, and the State recommended he serve life without parole for the aggravated murder conviction. The court agreed and sentenced him to concurrent prison terms of life without parole, five years to life, and zero to five years.

¶ 16 Mr. Ross appealed.

## STANDARD OF REVIEW

¶ 17 Mr. Ross preserved only the first of his four issues raised on appeal. As Mr. Ross's constitutional claim was preserved, we review that issue for correctness. *Wood v. Univ. of Utah Med. Ctr.*, 2002 UT 134, ¶ 7, 67 P.3d 436. "The issue of whether a statute is constitutional is a question of law, which we review for correctness, giving no deference to the trial court." *Id.* (internal quotation marks and citation omitted). Mr. Ross's other three claims were unpreserved, and we review them for plain error. *See State v. Pinder*, 2005 UT 15, ¶ 45, 114 P.3d 551; *State v. Nelson–Waggoner*, 2004 UT 29, ¶ 16, 94 P.3d 186. To prevail under plain error review, a defendant must demonstrate that " '(i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome.' " *State v. Lee*,

2006 UT 5, ¶ 26, 128 P.3d 1179 (quoting *State v. Hassan*, 2004 UT 99, ¶ 10, 108 P.3d 695).

## ANALYSIS

¶ 18 With our standard of review in hand, we turn to assessing the merits of Mr. Ross's four issues: (1) whether the subsection of the Utah death penalty statute, under which Mr. Ross stands convicted, is unconstitutionally vague; (2) whether Mr. Ross's aggravated murder conviction and attempted aggravated murder conviction should merge; (3) whether the impaneling of an anonymous jury prejudiced the jury against Mr. Ross; and (4) whether the alleged prosecutorial misconduct requires a new trial.

¶ 19 This opinion contains the majority as to issues (1), (3), and (4) and the dissent as to issue (2). The majority as to issue (2) is contained in the separate opinion of Chief Justice Durham, joined by Justice Durrant and Justice Parrish. The dissenting view in section II of this opinion is that of Justice Wilkins and me.

## I. UTAH CODE SECTION 76–5–202(1)(b) IS NOT UNCONSTITUTIONALLY VAGUE

¶ 20 We first address whether Utah Code section 76–5–202(1)(b) is unconstitutionally vague as applied to Mr. Ross. Mr. Ross insists that the vagueness of the aggravated murder statute does not measure up to the guarantees of due process of law and freedom from the imposition of cruel and unusual punishment enshrined in both the United States Constitution and the Utah Constitution. First, we hold that because Mr. Ross was not sentenced to death, he lacks standing to assert that the statute's vagueness exposed him to cruel and unusual punishment under the Eighth Amendment to the United States Constitution. Next, we reach the merits of Mr. Ross's constitutional due process assaults on section 76–5–202(1)(b), but we find that the statute survives them because it is not unconstitutionally vague as applied to Mr. Ross's conduct.

¶ 21 Section 76–5–202(1)(b) provides in pertinent part that

[c]riminal homicide constitutes aggravated murder if the actor intentionally or knowingly causes the death of another ... [where] the homicide was committed incident to one act, scheme, course of conduct, or criminal episode during which two or more persons were killed, or during which the actor attempted to kill one or more persons in addition to the victim who was killed.

Utah Code Ann. § 76–5–202(1)(b) (2003). According to Mr. Ross, the vulnerable language of the statutory text is the phrase "act, scheme, course of conduct, or criminal episode." Mr. Ross would have us conclude that this phrase is so vague that the Constitution renders it void.

¶ 22 We do not reach the merits of Mr. Ross's Eighth Amendment vagueness challenge because he does not have standing to bring his claim. Like the Fourteenth Amendment, the Eighth Amendment's Cruel and Unusual Punishment Clause prohibits vague statutes, but in this setting the Eighth Amendment will intercede only on behalf of defendants who face the death penalty.

¶ 23 Mr. Ross takes issue with this proposition. His objection, despite being off the mark, gives us cause to note the presence of two separate strands of Eighth Amendment jurisprudence. The first, and likely more familiar, is the proportionality strand. These cases explore the relationship between offenses and the severity of their resulting punishments. *See generally Ewing v. California*, 538 U.S. 11, 20–28, 123 S.Ct. 1179, 155 L.Ed.2d 108 (2003) (reviewing Supreme Court jurisprudence on the proportionality requirement of the Eighth Amendment). The second strand of cases looks to the Eighth Amendment as a basis upon which to insist that criteria used by sentencers to impose the death penalty be employed in a discriminating, principled way. The preeminent case in this strand is *Maynard v. Cartwright*, 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). It is to this component of the Eighth Amendment doctrine that Mr. Ross directs us when he challenges the constitutionality of section 76–5–202(1)(b).

¶ 24 The Eighth Amendment requires that statutory aggravators "channel

the sentencer's discretion by clear and objective standards that provide specific and detailed guidance and that make rationally reviewable the process for imposing a sentence of death." *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (internal quotation marks and citations omitted). Yet, "[t]o meet the standing requirements of Article III, '[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'" *Houston v. Roe*, 177 F.3d 901, 907 (9th Cir. 1999) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984)). Further, "[t]he injury must be distinct and palpable not merely speculative, and the harm must be imminent and not hypothetical." *Id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990)). In a case where the government does not seek the death penalty or where the defendant is not sentenced to death, there can be no actual or threatened injury caused by vagueness in the death penalty statute that is sufficient to justify standing. *Id.*

¶ 25 Our approach to Eighth Amendment challenges to Utah's death penalty statute is in harmony with federal jurisprudence on the topic as we, too, have denied standing to a defendant not sentenced to death who, under the Eighth Amendment, sought to challenge the vagueness of the aggravating circumstances set out in Utah's death penalty statute. *State v. Tuttle*, 780 P.2d 1203, 1215 (Utah 1989). Mr. Ross was sentenced to life in prison without the possibility of parole. And like the defendant, Mr. Tuttle, Mr. Ross lacks standing to challenge the statute under the Eighth Amendment.

¶ 26 Mr. Ross appears to believe that our conclusion that Mr. Tuttle did not have standing because he was not sentenced to death was wrong because the United States Supreme Court has made the Eighth Amendment available to challenge sentences less than death. The Supreme Court cases cited by Mr. Ross to make this point are, however, cases culled from the proportionality strand of Eighth Amendment jurisprudence that have nothing to do with the interpretation and application of death penalty statutes.

¶ 27 While standing does not foreclose Mr. Ross's remaining due process claims, we find none to be compelling. In order to establish that statutes are so vague that they violate due process, "a defendant must demonstrate either (1) that the statutes do not provide 'the kind of notice that enables ordinary people to understand what conduct [is prohibited],' or (2) that the statutes 'encourage arbitrary and discriminatory enforcement.'" *State v. MacGuire*, 2004 UT 4, ¶ 13, 84 P.3d 1171 (alteration in original) (quoting *State v. Honie*, 2002 UT 4, ¶ 31, 57 P.3d 977); *see also Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). And where, as here, a defendant's claim does not concern an alleged infringement of a First Amendment right, the defendant must first show that the statute is vague as applied to his conduct, before he can attempt to show that the statute is vague in all of its applications. *State v. Green*, 2004 UT 76, ¶¶ 44, 45 n. 15, 99 P.3d 820 (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). This means that a defendant may not complain of the vagueness of the law as applied to others if its language affords the defendant adequate notice that his conduct was proscribed. *Id.*

¶ 28 First, we find that the language of section 76–5–202(1)(b) is sufficiently clear to give Mr. Ross notice that the behavior he engaged in was prohibited. The statute provides that a murder charge may be increased to aggravated murder if it is committed "incident to one act, scheme, course of conduct, or criminal episode" where another murder is completed or attempted. Utah Code Ann. § 76–5–202(1)(b). Although we do not concede that the statute requires additional clarification to impart sufficient notice on those who might wish to modify their conduct to avoid its application, we will nevertheless point out several of its most obvious organizing features. To trigger section 76–5–202(1)(b), additional murders or their attempts must be related in some way to one another. Close temporal proximity is the most apparent measure of linkage, as the phrase "incident to one act" suggests. Time is not the only possible connecting character-

istic, however, inasmuch as multiple murders or attempts incident to one "scheme" may occur over an extended period of time. The relevant nexus connoted by "scheme" is a plan that targets multiple victims. *See State v. Bradshaw*, 2006 UT 87, ¶¶ 12–16, 152 P.3d 288 (discussing when multiple related acts may constitute a single scheme in the communications fraud context). A single "course of conduct" implies a more lengthy duration than an "act" and a lesser emphasis on planning than a "scheme," but nevertheless, the term includes elements of both act and scheme. One "criminal episode" is, like "scheme," not particularly temporally dependent, but rather appears to address even otherwise random murders or attempts committed while the defendant is undertaking another criminal activity. Contrary to what Mr. Ross suggests, the terms "act," "scheme," "course of conduct," and "criminal episode" have common, generally understood meanings. And where statutory terms are "readily ascertainable," the vagueness doctrine does not require a legislature to redefine them. *See MacGuire*, 2004 UT 4, ¶ 31, 84 P.3d 1171.

¶ 29 Moreover, the statutory terms acquire greater clarity when considered in the context of the whole provision. The individual terms are shaped and their definitional contours sharpened through comparisons and contrasts to their companions. Thus, the clarity of the whole of the statute is greater than the sum of its individual parts. The individual terms "act," "scheme," "course of conduct," and "criminal episode," taken together in context of the statute, indicate a requirement that the foundational act (a murder) and the aggravating act (a second murder or an attempted murder) be linked by a degree of commonality. Whether time, place, manner, purpose, or a combination of the four serve to link the foundational act to the aggravating act for the purpose of this statute, it is clear that the statute requires that there be some indicia that separate acts are parts of a whole.

¶ 30 Stated most simply, section 76-5-202(1)(b) applies to murders or attempts linked by time, place, or purpose. It is clear to us that the statute would fully communicate to Mr. Ross, as he stood armed with jealous rage and a pistol, waiting for Ms. Christensen to answer her door early on the morning of June 30, that what could transpire in the ensuing minutes could well be crimes and tragedies incident to one criminal episode or course of conduct.

¶ 31 Mr. Ross killed Ms. Christensen and attempted to kill Mr. May in a sequence of events closely linked by all three elements of time, place, and purpose. A simple timeline of events illustrates how closely related in time, place, and purpose Mr. Ross's actions were: Mr. Ross drove to Ms. Christensen's home; he rang the doorbell, entered Ms. Christensen's home, and questioned her and Mr. May; he forced Ms. Christensen into her bedroom and shot and killed her with three bullets; he found Mr. May in the garage, chased after him, and fired six bullets, injuring Mr. May with the second shot; he called Ms. Christensen's father, told him that he had just killed his daughter, and that he was on his way to Mr. Christensen's home to "finish the job"; and finally, while still driving, he was apprehended by the police. All of this occurred between 6:00 a.m. and 7:00 a.m.

¶ 32 The trial evidence—most prominently Mr. Ross's interrogation of Ms. Christensen regarding the recent sexual activity of Ms. Christensen and Mr. May—leaves little doubt that Mr. Ross's jealousy and anger over Ms. Christensen's spurning of his affections impelled him to appear at Ms. Christensen's door. We have little difficulty matching the terms "course of conduct" and "criminal episode" to the murder and attempted murder that Mr. Ross committed within the span of less than one hour, motivated by his jealousy and rage. It may be that, at the boundaries, the statute is unclear about when two or more separate acts are part of a single whole. But this is not a boundary case. The statute, therefore, is constitutional as applied to Mr. Ross.

## II. MR. ROSS'S ATTEMPTED AGGRAVATED MURDER CONVICTION SHOULD NOT MERGE WITH HIS AGGRAVATED MURDER CONVICTION

¶ 33 We next take up Mr. Ross's claim that the trial court committed plain error when it

permitted the jury to convict him of both aggravated murder and attempted aggravated murder, instead of merging the two convictions into a single crime. Although I do not hold the majority on this issue, I would find that no error occurred because Utah Code section 76–5–202 is an enhancement statute; the two convictions therefore should not merge.

¶ 34 Mr. Ross contends that merger was mandated because the attempted murder charge was a necessary predicate to, and a lesser included offense of, the aggravated murder charge. Utah Code section 76–1–402(3) permits greater and lesser included offenses to merge. An offense is "lesser included" and eligible for merger when "[i]t is established by proof of the same or ·less than all the facts required to establish the commission of the [greater] offense charged...." Utah Code Ann. § 76–1–402(3)(a) (2003). We have interpreted this provision to mean that "where the two crimes are 'such that the greater cannot be committed without necessarily having committed the lesser,' then as a matter of law they stand in the relationship of greater and lesser offenses, and the defendant cannot be convicted or punished for both." State v. Hill, 674 P.2d 96, 97 (Utah 1983) (quoting State v. Baker, 671 P.2d 152, 156 (Utah 1983)). Although merger is codified in statute, it has a constitutional pedigree as it provides a means to prevent violations of constitutional double jeopardy protection. State v. Smith, 2005 UT 57, ¶ 7, 122 P.3d 615.

¶ 35 A criminal statute is freed from double jeopardy concerns and exempted from the merger requirements in Utah Code section 76–1–402(3) if it is clear from the "plain language and structure" of the pertinent provision that the statute is an enhancement statute, i.e., that the legislature "intended to enhance the penalty for one type of offense when certain characteristics are present that independently constitute a different offense." Id. ¶ 11. Enhancement statutes differ from other criminal statutes by singling out "particular characteristics of criminal conduct as warranting harsher punishment." Id. ¶ 10 (citing State v. McCovey, 803 P.2d 1234, 1237 (Utah 1990)). But "if the legislature intends to preclude [a statute] from requiring merger in a specific instance, it must clearly indicate that the provision in question is intended to enhance the penalty for one type of offense when certain characteristics are present that independently constitute a different offense." Id. ¶ 11.

¶ 36 In Smith, we held Utah Code section 76–10–504(3) to be an enhancement provision because it enhances "the penalty for the offense of carrying a concealed firearm when the offense is committed in conjunction with a crime of violence, a separate offense." Id. ¶ 13. We found it relevant that the statute enumerated various levels of offenses depending on the type of weapon involved and on the circumstances in which carrying a concealed weapon occurs. Id.

¶ 37 Our experience in assessing the characteristics of an enhancement statute in Smith serves us well here. While Utah Code section 76–5–202 lacks the clear-cut "graduated punishment scale" of Utah Code section 76–10–504(3), it unmistakably enhances "criminal homicide" to "aggravated murder" when the murder is committed in conjunction with one of the several enumerated aggravating circumstances, some of which constitute separate, independent crimes. Section 76–5–202 does not define aggravated murder by setting out a set of elements unique to that offense. Rather, the statute provides that murder should be enhanced to aggravated murder when a homicide is accompanied by one of several listed aggravators. Specifically, the aggravating circumstance at issue here requires that murder be enhanced to aggravated murder if the murder is committed incident to a single "act, scheme, course of conduct, or criminal episode ... during which the actor attempted to kill one or more persons in addition to the victim who was killed." Utah Code Ann. § 76–5–202(1)(b). The purpose and effect of this language— dictated by the plain language and structure of the statute—is to enhance the degree of punishment for the murder because it was committed in conjunction with an attempted murder, a separate offense. Thus, the structure of section 76–5–202 demonstrates to our satisfaction that its purpose is to single out circumstances that merit a greater *degree* of

punishment for murder than that otherwise provided for perpetrators of criminal homicide. The statute is, therefore, an enhancement statute not subject to the merger doctrine. The trial court did not err when it permitted the jury to convict Mr. Ross of both aggravated murder and attempted aggravated murder.

¶ 38 The majority takes issue with this assessment and asserts that under Utah Code section 76–1–402(3) the attempted murder and the aggravated murder charges against Mr. Ross should be merged. Pointing to *State v. Shaffer*, 725 P.2d 1301 (Utah 1986), and *State v. Wood*, 868 P.2d 70 (Utah 1993), *overruled on other grounds by State v. Mirquet*, 914 P.2d 1144 (Utah 1996), the majority contends that this court has already found that the merger doctrine applies to Utah Code section 76–5–202, the aggravated murder statute. I am neither persuaded that we have, nor that we should.

¶ 39 It is true that we held in both *Shaffer* and *Wood* that the underlying aggravating crime should merge with the aggravated murder charge. What we did not discuss in either case was whether section 76–5–202 was an enhancement statute and, thus, exempt from the merger requirements. In *Smith*, we emphasized the need to determine whether a statute was an enhancement statute as a necessary third step in the merger analysis: "In *McCovey*, however, this court in effect added a third step to the [merger] analysis, holding that in cases where the legislature intended a statute to be an enhancement statute, the merger doctrine set forth in section 76–1–402(3) does not apply." 2005 UT 57, ¶ 9, 122 P.3d 615 (citing *McCovey*, 803 P.2d at 1237). Because neither *Shaffer* nor *Wood* mentions section 76–5–202 in the context of enhancement,[1] those cases do not control our decision on the enhancement question. And because my decision rests on our determination that, under *Smith*, section 76–5–202 is an enhancement statute, I am not troubled by *Shaffer's* and *Wood's* holdings that section 76–5–202 meets

the first two of the three steps in a merger analysis.

## III.  THE IMPANELING OF AN ANONYMOUS JURY DOES NOT REQUIRE A NEW TRIAL

■ ¶ 40 We next consider whether the trial court committed plain error when it impaneled an anonymous jury. We conclude that the trial court was justified in believing it confronted a need to protect the jury from media exposure and that this concern could be effectively addressed by impaneling an anonymous jury. We further conclude that the trial court implemented reasonable and workable precautions to ensure that Mr. Ross was not prejudiced by the decision to refer to jurors by number instead of by name.

¶ 41 Our task of considering whether or not it is appropriate to impanel an anonymous jury is an issue of first impression for this court. The absence of any direction from our appellate courts on the subject of anonymous juries is reason enough to overcome an unpreserved issue for which review is sought based on plain error since a trial court could hardly be faulted for failing to take note of jurisprudence that does not exist. *See State v. Ross*, 951 P.2d 236, 239 (Utah Ct.App.1997). Still, if the trial judge should have apprehended that by impaneling an anonymous jury he would prejudice Mr. Ross or if the trial court had impaneled the anonymous jury in a manner that resulted in prejudice, we could reach the merits and, if appropriate, provide a remedy by invoking the plain error exception to our preservation requirement, even in the absence of clear Utah precedent on the matter. We do not believe that the trial judge plainly erred in this instance. But because there is no present guidance for trial courts on this question, we take this opportunity first to outline the principles that should guide a trial court when faced with the issue of whether and how to impanel an anonymous jury and then

---

1. We decided *Shaffer* before we added the third step in the merger analysis in *McCovey*. And in *Wood*, which was decided after *McCovey* but before we further clarified our *McCovey* holding in

*Smith*, the question of whether section 76–5–202 was an enhancement statute was not raised as an issue and we, consequently, did not discuss it.

to note that this trial judge acted well within those parameters.

¶ 42 We would not, however, liberally exercise our authority to intercede to undo a trial judge's decision to impanel an anonymous jury because that decision is highly fact intensive and well within the scope of a trial judge's discretionary powers. *See State v. Samonte*, 83 Hawai'i 507, 928 P.2d 1, 17 (1996). It is a decision that requires a trial judge to draw on the training and temperament that form the very core of judging and is therefore a decision that is entitled to deferential treatment by a reviewing court. *See State v. Bowles*, 530 N.W.2d 521, 531 (Minn.1995).

¶ 43 Judges properly enjoy considerable latitude in conducting the affairs of their courtroom so long as courtroom procedures do not communicate bias against the defendant. When impaneling an anonymous jury, we deem it wise that trial courts exercise their discretion in a manner consistent with the approach adopted by the federal courts, which includes (1) finding a compelling reason to believe the jury needs protection from external sources and (2) taking reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that the defendant's rights are protected. *See, e.g., State v. Brown*, 280 Kan. 65, 118 P.3d 1273, 1279 (2005).

¶ 44 While the trial court in this case did not have the benefit of precedent from this court, we believe that it impaneled an anonymous jury appropriately and, in fact, adhered closely to the principles reflected in these two guidelines. First, the trial court had a compelling reason to impanel an anonymous jury. Compelling reasons for impaneling an anonymous jury include: (1) the defendant's involvement in organized crime; (2) the defendant's participation in a group with the capacity to harm jurors; (3) the defendant's past attempts to interfere with the judicial process; (4) the potential that, if convicted, the defendant will suffer a lengthy incarceration and substantial monetary penalties; and (5) extensive publicity that could enhance the possibility that the jurors' names become public and expose them to intimidation or harassment. *Id.; see also United States v.*

*Ross*, 33 F.3d 1507, 1520 (11th Cir.1994); *United States v. Coonan*, 664 F.Supp. 861, 862 (S.D.N.Y.1987); *Samonte*, 928 P.2d at 14.

¶ 45 The trial court presiding over Mr. Ross's trial impaneled an anonymous jury because of the threat of extensive publicity about the case. As our factual narrative amply demonstrates, this was a crime that featured an embittered ex-lover, a gruesome killing, a suspenseful escape, a police chase, and an abundance of other elements that made the trial an irresistible media event. The trial court's desire to protect the jurors' privacy and its concern about how significant media attention might jeopardize the ability of the jury to do its work justified its decision to opt for an anonymous jury.

¶ 46 The trial court also took precautions to mitigate any potential prejudice that the defendant might suffer as a result of being tried before an anonymous jury. Courts typically rely on two general precautions to minimize the prejudicial effects of an anonymous jury: (1) ensuring a meaningful voir dire to expose bias and (2) offering jury instructions designed to eliminate any implication of the defendant's guilt. *Samonte*, 928 P.2d at 13–14; *State v. Ford*, 539 N.W.2d 214, 221 (Minn.1995); *Bowles*, 530 N.W.2d at 530. The trial court here—again unaided by any precedent from this court—took each of these precautions to ensure that Mr. Ross was not unfairly prejudiced.

¶ 47 Effective voir dire, one in which counsel and the trial court are able to fully explore and expose bias, is a powerful antidote to any prejudice, including that which might result from an anonymous jury. *Samonte*, 928 P.2d at 15–16. Ensuring that jury anonymity does not interfere with the opportunity to conduct a meaningful voir dire, therefore, is critical.

¶ 48 In this case, voir dire was meaningful, with measures taken to expose the biases of the jurors. In addition to the jury questionnaire, the court asked some follow-up questions in private interviews concerning specific answers the potential jurors provided in the questionnaires. It asked them about their feelings regarding the death penalty and whether they "could be fair to both pros-

ecution and defense on the issue of punishment." The court informed the jurors that "the defendant is presumed innocent and all presumptions of law are in favor of his innocence." Finally, it told them that "the defendant is never required to prove his innocence." This effective voir dire mitigated any prejudice that Mr. Ross might have suffered from being tried before an anonymous jury.

¶ 49 To further reduce the risk of prejudice, a trial court should instruct jurors in a way that recognizes the threat that an anonymous jury poses to a defendant's presumption of innocence. This may be accomplished in many ways, including, for example, taking care to avoid calling attention to the anonymity of the jury or otherwise suggesting that, owing to its uniqueness, jury anonymity is reserved for a trial of particularly heinous crimes or dangerous and obviously guilty defendants. Among instructions emphasizing the presumption of innocence, "[t]he trial court should give anonymous jurors a plausible and nonprejudicial reason for not disclosing their identities that decreases the probability that the jurors would infer that the defendant is guilty or dangerous." *Samonte*, 928 P.2d at 16. For example, a court might instruct anonymous jurors that "the purpose for juror anonymity is to protect the jurors from contacts by the news media, thereby implying that juror anonymity is not the result of threats from the criminal defendant." *Id.*

¶ 50 In this case, the trial judge met every reasonable expectation we could impose on him to send the jury into its deliberations free of any sense that their anonymity somehow implied that Mr. Ross was guilty. Specifically, the trial court advised the jurors, on more than one occasion, that their anonymity was to protect their privacy and to encourage their candor during the voir dire process. Further, the court explained in its decorum order that another purpose of anonymity was to shield the jurors from potential media harassment. This order offered jurors a plausible and nonprejudicial explanation for why they were impaneled anonymously, which reduced the possibility that they be-

lieved their anonymity was tied to Mr. Ross's guilt or dangerous nature.

¶ 51 Additionally, jurors should have known from in-chamber interviews that their anonymity was primarily for privacy and protection from the media, not from Mr. Ross. With one exception, each prospective juror was addressed by both name and number during in-chamber interviews. In four different interviews, defense counsel referred to prospective jurors by name, and the State did so three times.

¶ 52 In sum, the trial court did not plainly err in impaneling an anonymous jury. It had sufficient cause to do so, including the need to protect the jury from the media and to encourage candor during the voir dire process. The court also took reasonable precautions to minimize prejudicial effects on Mr. Ross by ensuring a thorough voir dire process and by providing a plausible and nonprejudicial explanation for the jurors' anonymity.

## IV. THE STATE'S REMARKS DID NOT CONSTITUTE PROSECUTORIAL MISCONDUCT, AND TRIAL COUNSEL'S FAILURE TO OBJECT DID NOT CONSTITUTE INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 53 Finally, we consider whether the State's remarks during closing arguments constitute prosecutorial misconduct. Applying our plain error standard of review, we hold that they do not. Even if the statements made by the State during closing arguments were not all fair inferences drawn from the evidence proffered during trial, they were harmless in the face of the overwhelming evidence of Mr. Ross's guilt. Therefore, it was not plain error for the trial court not to have intervened when the State stretched evidence regarding the only disputed point in the case—whether Mr. Ross's shooting of Ms. Christensen and Mr. May was incident to "one act, scheme, course of conduct, or criminal episode" under Utah Code section 76–5–202(1)(b) (2003).

¶ 54 This court set forth the test for prosecutorial misconduct in *State v. Valdez*, stating:

The test of whether the remarks made by counsel are so objectionable as to merit a reversal in a criminal case is, did the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by those remarks.

30 Utah 2d 54, 513 P.2d 422, 426 (1973). This two-part test must be applied "under the circumstances of the particular case." *State v. Troy,* 688 P.2d 483, 486 (Utah 1984). In assessing the second component of the test, " '[i]f proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial.' " *Id.* (quoting *State v. Seeger,* 4 Or.App. 336, 479 P.2d 240, 241 (1971)). If prosecutorial misconduct is established, the State must show that the error was harmless beyond a reasonable doubt. *State v. Eaton,* 569 P.2d 1114, 1116 (Utah 1977).

¶ 55 Our review of a prosecutor's conduct must also take into account that "[a] prosecutor has the duty and right to argue the case based on the 'total picture shown by the evidence or the lack thereof.' " *State v. Hales,* 652 P.2d 1290, 1291 (Utah 1982) (quoting *State v. Kazda,* 540 P.2d 949, 951 (Utah 1975)). Furthermore, "[c]ounsel for both sides have considerable latitude in their closing arguments. They have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports." *State v. Dibello,* 780 P.2d 1221, 1225 (Utah 1989); *see also State v. Lafferty,* 749 P.2d 1239, 1255 (Utah 1988).

¶ 56 The State did, in fact, seize a sizeable portion of latitude during closing arguments in recounting the events surrounding the death of Ms. Christensen. For example, the State implied that Mr. Ross ordered both Ms. Christensen and Mr. May back to the bedroom, but Mr. May actually testified that Mr. Ross only pushed Ms. Christensen toward the bedroom.[2] Also, the State reminded the jury that Mr. May said "very few seconds" elapsed between the time when Mr. Ross killed Ms. Christensen and when he approached Mr. May in the garage and began shooting at him. Mr. May, however, gave no specific time frame for the sequence of the events.[3] The jury could infer from these remarks that the attempt to kill Mr. May was part of the same "act, scheme, course of conduct, or criminal episode" as the murder of Ms. Christensen, which was required to convict Mr. Ross of aggravated murder.

¶ 57 While these two remarks were questionable—especially considering that they bear on the main issue in the case of whether or not Mr. Ross was guilty of murder or aggravated murder—they were also harmless given the weight of evidence against Mr. Ross. Proof of Mr. Ross's guilt is strong in this case. In fact, at trial, Mr. Ross conceded in closing argument that he did not dispute the State's evidence and that there was not "much doubt, in view of the evidence that [he] killed Ms. Christensen, and that he attempted to kill Mr. May." The question then became whether "the homicide was committed incident to one act, scheme, course of conduct, or criminal episode ... during which [Mr. Ross] attempted to kill one or more persons in addition to the victim who was killed." Utah Code Ann. § 76–5–202(1)(b).

¶ 58 As we indicated in section I of our analysis, there is ample evidence in the record to demonstrate that the murder of Ms. Christensen and the attempted murder of Mr. May were, indeed, two parts of a single "act, scheme, course of conduct, or criminal episode." Specifically, the evidence shows that Mr. Ross showed up at Ms. Christen-

---

2. In closing arguments, the State said, "[Mr. Ross] doesn't order just [Ms. Christensen] back to that bedroom. He orders Mr. May back to the bedroom as well. He starts them back to the bedroom." Mr. May actually testified that Mr. Ross grabbed Ms. Christensen's arm and pushed her toward the bedroom. After another exchange, Mr. Ross pushed past Mr. May and, again, pushed Ms. Christensen to the bedroom.

3. Although Mr. May said that he heard the shots that killed Ms. Christensen while he was trying to start his car and that "the next thing I noticed I was looking up and there he was right in the doorway," he never testified that "very few seconds" elapsed.

sen's home with a loaded, concealed handgun. After speaking to both Ms. Christensen and Mr. May, Mr. Ross took Ms. Christensen into the bedroom and shot her. Mr. Ross proceeded directly to the garage, where Mr. May was attempting to flee. Mr. Ross chased Mr. May out of the garage and fired six shots at him, injuring him with one of the shots. Mr. Ross then called Ms. Christensen's father and told him that he had just shot his daughter and that he was on his way to Mr. Christensen's home to finish the job. The evidence that the murder and the attempted murder were part of a single "act, scheme, course of conduct, or criminal episode" is strong, even absent the questionable statements made by the prosecution in its closing arguments. The doctrine of prosecutorial misconduct, therefore, does not apply, and it was not plain error for the trial court not to have intervened.

## CONCLUSION

¶ 59 In conclusion, we hold that Utah Code section 76–5–202(1)(b) is not unconstitutionally vague since the plain meaning of the statutory terminology provides sufficient notice of the prohibited conduct. We also hold that the impaneling of an anonymous jury, under the circumstances of this case, does not require a new trial, particularly where the trial court took necessary precautions to ensure that this procedure was not unfairly prejudicial to Mr. Ross. Finally, the State's remarks during closing arguments did not constitute prosecutorial misconduct given the weight of evidence against Mr. Ross. We therefore affirm Mr. Ross's convictions for aggravated murder. The majority finds that Mr. Ross's aggravated murder conviction and his attempted aggravated murder conviction should merge and vacates his attempted aggravated murder conviction.

¶ 60 Associate Chief Justice WILKINS concurs in Justice NEHRING's opinion.

DURHAM, Chief Justice, writing for the majority:

¶ 61 According to this court's precedent, an underlying felony that constitutes the aggravating circumstance merges with the conviction for aggravated murder pursu-

ant to Utah Code section 76–5–202. Therefore, it was impermissible for the trial court to allow convictions to stand for both aggravated murder and attempted aggravated murder when the attempted murder of Mr. May was the only aggravating factor presented to the jury.

¶ 62 Aggravated murder, a capital crime, "requires proof of a statutorily defined aggravating circumstance in addition to an intentional and knowing killing." *State v. Shaffer*, 725 P.2d 1301, 1313 (Utah 1986). In the instant case, the sole aggravating circumstance presented to the jury was whether "the homicide was committed incident to one act, scheme, course of conduct, or criminal episode ... during which the actor attempted to kill one or more persons in addition to the victim who was killed." Utah Code Ann. § 76–5–202(1)(b) (2003). Proof of the attempted murder of Mr. May served as the aggravating circumstance allowing for Mr. Ross's conviction for capital murder.

¶ 63 The merger doctrine, derived from the Fifth Amendment's Double Jeopardy Clause, prevents a defendant from being convicted of "both the offense charged and the included offense." Utah Code Ann. § 76–1–402(3) (2003 & Supp.2007). An offense is included when "[i]t is established by proof of the same or less than all the facts required to establish the commission of the offense charged." *Id.* § 76–1–402(3)(a). In the case before us, where the attempted murder of Mr. May was the sole aggravating factor presented to the jury, the attempted murder is a lesser included offense of the aggravated murder. Proof of the facts of the attempted murder were necessary to establish the commission of the aggravated murder.

¶ 64 On more than one occasion, this court has determined that the merger doctrine applies to Utah Code section 76–5–202. In *State v. Shaffer*, we held that aggravated robbery merged with aggravated murder when robbery was the sole aggravating circumstance for the capital murder conviction. 725 P.2d at 1313. Similarly, in *State v. Wood*, we held that the predicate offense of aggravated sexual assault merged with the conviction for aggravated murder. 868 P.2d

70, 90 (Utah 1993), *overruled on other grounds by State v. Mirquet*, 914 P.2d 1144 (Utah 1996).[1] Since *Shaffer* and *Wood* were decided, the legislature has not modified the provisions of Utah Code section 76–5–202 in any manner that would alter our analysis. *Compare* Utah Code Ann. § 76–5–202 (2003), *with id.* § 76–5–202 (Supp.1993), *and id.* § 76–5–202 (Supp.1986). Although the legislature has added new aggravating factors and affirmative defenses, it has done nothing to "clearly indicate that the provision ... is intended to enhance the penalty for [murder] when certain characteristics are present." *State v. Smith*, 2005 UT 57, ¶ 11, 122 P.3d 615. We have previously stated that such explicit indication is required, *id.*, and the legislature has had ample opportunity to exempt aggravated murder from the doctrine of merger by amending the statute to clearly indicate that it is intended to operate only as an enhancement provision. "[T]he court has no power to rewrite a statute to make it conform to an intention not expressed." *State v. McCovey*, 803 P.2d 1234, 1240 (Utah 1990) (Durham, J., dissenting) (internal quotation marks omitted). Absent action by the legislature, *Shaffer* and *Wood* are still good law, and the dissent's effort to read section 76–5–202 as an enhancement statute is improper absent clear legislative action.[2]

¶ 65 The aggravating circumstance in this case was the attempted murder. Like the predicate felonies in *Shaffer* and *Wood*, when the aggravating circumstance is a crime, it must merge with the greater offense if no other independent ground exists to raise the charge to aggravated murder.[3] To allow the attempted murder charge to be used as the sole means of aggravation and as its own separate offense permits double counting of the offense in violation of double jeopardy and the merger doctrine.

¶ 66 Mr. Ross could have been convicted of murder and attempted murder. When the jury convicted Mr. Ross for aggravated murder, the attempted murder of Mr. May, a necessary element to prove the aggravated murder, merged with the capital felony. Accordingly, Mr. Ross could be convicted of only aggravated murder.

¶ 67 We affirm the conviction for aggravated murder and vacate the conviction for attempted aggravated murder. The practical effect of this decision is that Mr. Ross will serve one life sentence without the possibility of parole instead of two. *See State v. Hill*, 674 P.2d 96, 98 (Utah 1983) ("[I]t is appropriate to regard the conviction on the lesser offense as mere surplusage, which does not invalidate the conviction and sentence on the greater offense.").

¶ 68 Justice DURRANT and Justice PARRISH concur in Chief Justice DURHAM's opinion.

---

1. In *Wood*, the aggravating circumstance that the murder was heinous and depraved was not treated as a separate aggravating circumstance because "the heinousness and depravity arose directly out of the aggravated sexual assault.... [T]he heinousness and the [sexual assault] were the same factually and should be treated legally for merger purposes as one aggravating circumstance." 868 P.2d at 90.

2. Even absent our precedent, the aggravated murder statute does not evidence a "graduated punishment scale ... indicative of an enhancement statute." *Smith*, 2005 UT 57, ¶ 3, 122 P.3d 615 (internal quotation marks omitted). In *Smith*, the concealed weapon statute at issue listed circumstances in which carrying a concealed weapon could be either a class B misdemeanor, a class A misdemeanor, or a second degree felony. *Id.* ¶ 12. The structure of section 76–5–202 is unlike that at issue in *Smith*; all aggravated murders are capital felonies.

3. *See State v. Young*, 853 P.2d 327, 367 (Utah 1993) (recognizing that a "defendant could be convicted of a crime that might also serve as the basis for an aggravating circumstance if the prosecution did not rely on that crime for proof of the aggravating circumstance," and on that basis holding that the theft conviction did not merge with the first degree murder conviction under Utah Code section 76–5–202).