IN THE UTAH COURT OF APPEALS

----ooOoo----

| | | |
|---|---|---|
| State of Utah, | ) | OPINION |
| | ) | |
| Plaintiff and Appellee, | ) | Case No. 20090372-CA |
| | ) | |
| v. | ) | F I L E D |
| | ) | (April 12, 2012) |
| Konstantin Kozlov, | ) | |
| | ) | 2012 UT App 114 |
| Defendant and Appellant. | ) | |

-----

Fourth District, Provo Department, 081401858
The Honorable Fred D. Howard
The Honorable Claudia Laycock

Attorneys:     Elizabeth Hunt, Salt Lake City, for Appellant
               Mark L. Shurtleff and Christopher D. Ballard, Salt Lake City, for
               Appellee

-----

Before Judges McHugh, Orme, and Christiansen.

CHRISTIANSEN, Judge:

¶1     Defendant Konstantin Kozlov appeals his convictions following a jury trial for attempted rape, *see* Utah Code Ann. § 76-5-402 (2008) (rape); *id.* § 76-4-101 (attempt); forcible sexual abuse, *see id.* § 76-5-404; and domestic violence in the presence of a child, *see id.* § 76-5-109.1(2)(c).  We affirm.

BACKGROUND[1]

I. Defendant and the Victim's Relationship[2]

¶2     Defendant and his friend (the roommate) met the victim when they all worked together at McDonald's.  Subsequently, they moved into the same house, along with the victim's children.  Prior to this arrangement, the victim and her children did not have a permanent residence.  Defendant paid the victim's portion of the rent while she lived with Defendant.  Defendant also bought the victim and her children gifts, paid for some of her other expenses, and bought a plane ticket for one of the victim's children.  Defendant developed a relationship with the victim's children, and according to the victim, her children loved Defendant.  Defendant seemed to want a romantic relationship with the victim.  Although the victim accepted his gifts and financial assistance, she was not and did not intend to be romantically involved with him.  In fact, about a month after she moved in with Defendant, the victim married a man in another state though the victim continued to live with Defendant, and for some time she did not tell him that she had married.

¶3     After living with Defendant for approximately seven months, the victim decided that, despite her financial instability, she needed to move out of Defendant's residence because she had become increasingly concerned that Defendant would force her into a sexual relationship with him.  According to the victim, Defendant became more aggressive toward her, and he began to follow her, call her bad names, listen to her phone calls, and appear at her workplace where he would remain for two or three hours.[3]  One night, Defendant entered the victim's room while she was sleeping,

---

1. "Because this case comes to this court after a jury trial, we view the 'facts in a light most favorable to the jury's verdict' and 'present conflicting evidence only as necessary to understand [the] issue[ ] raised on appeal.'"  *State v. Samples*, 2012 UT App 52, ¶ 2 n.2 (mem.) (alterations in original) (quoting *State v. Holgate*, 2000 UT 74, ¶ 2, 10 P.3d 346).

2. Background sections I and II rely mainly on the victim's trial testimony that was, for the most part, uncontested.

3. Although Defendant and the victim met while working together at McDonald's, these particular visits appear to have occurred after Defendant's employment had ended at that restaurant.  The McDonald's supervisor testified that during these visits,

(continued...)

struggled with her, and would not leave when she asked. Thereafter, the victim and her children moved to a new apartment for which Defendant paid the deposit.

## II. Events Leading to the Charges Against Defendant

¶4    On the night of June 28, 2008, Defendant and the victim argued while talking on the phone. Despite the victim telling Defendant not to come to her apartment, he insisted that he was coming over and that if she did not open her door for him, he would kick the door down. Defendant arrived at the victim's apartment around midnight, and when the victim said that she did not want to talk to him, he again told her that if she did not open the door he would kick it down or go through the window. The victim then let Defendant in but told him that she would talk with him for only five minutes.

¶5    While she and Defendant were sitting on the stairs talking, the victim heard her three-year-old child cry out. The victim went upstairs into her bedroom where her children were sleeping and lay in the bed next to her child to calm the child. Defendant followed the victim to the bedroom and refused to leave the room, despite the victim's request that he do so.

¶6    Instead of leaving, Defendant lay next to the victim on the bed and began touching her breast over her shirt. When she told him to stop, he said, "No," and she slapped him.[4] Defendant then grabbed her hands with one of his hands and touched the victim's genitals over her clothes with his other hand. The victim kept telling

---

3. (...continued)
the victim's "demeanor would change"; that when Defendant would bring the victim gifts, the victim always gave them to other crew members; and that Defendant and the victim "would have a conversation [that] almost always was an argument." Additionally, the McDonald's supervisor testified that although she told Defendant fifteen to twenty times that he was no longer welcome at the restaurant, Defendant told her that he could do what he wanted and continued to appear there. Finally, the supervisor told him that "if he continued to show up, [she] was going to call the police."

4. Up until this point, the victim's and Defendant's versions of the events were mostly in agreement. Because the victim's version was the only one given at trial, we refer to the victim's description of the events. Later, we discuss what Defendant told the police and the facts that Defendant challenged when cross-examining the victim.

Defendant to stop, to leave, and that she was going to call the police. Defendant responded by saying that he did not care and that he did not believe she would call the police. The victim also tried to get Defendant to stop touching her by kicking him, hitting him, pulling his hair, pinching him, moving her legs, and struggling throughout the encounter. While holding her hands and partially lying on top of her, Defendant touched the victim's breasts under her clothing, pulled the victim's pajama pants down, and touched her genitals with his hand. When the victim again told Defendant to leave, he refused and told her he could "do whatever [he] want[ed]." While on top of and between the victim's legs, Defendant removed his pants and attempted to penetrate the victim's vagina with his penis. However, Defendant was unable to maintain an erection, so his attempt to have intercourse with the victim was unsuccessful. Defendant also grabbed the victim's jaw to try to kiss her and told her that he loved her, to which the victim responded that she did not care. Defendant then moved next to the victim, grabbed the victim's right hand, and forced her to touch his penis.

¶7     The victim's seven-year-old child, who was asleep in the same bed until that point, then woke up and said, "Mommy, are you okay?" When Defendant released the victim upon hearing the child, the victim grabbed her phone, which had previously been out of her reach, and called the police. Defendant put his pants back on, went downstairs, and waited for the police. The victim followed him and stood in the door frame of her house until the police arrived.

III. Defendant's Interrogation[5]

¶8     Officers Stuart Fore and Shauna Lee Greening responded to the victim's complaint to the dispatcher that Defendant would not leave her residence. After speaking with the victim, Officer Fore approached Defendant, who had been waiting with Officer Greening. Officer Fore then advised Defendant of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), stopping after each right to ask Defendant if he understood. Officer Fore also answered Defendant's question about the role of an attorney. After Defendant acknowledged that he understood his rights, Defendant communicated with and responded to Officer Fore's questions in English. Specifically, the officer asked about Defendant's relationship with the victim and about his version of what had happened earlier that night. Officer Fore then drove Defendant to the police station, which took approximately two minutes.

---

5. These facts were presented at hearings and in other record evidence, such as the recording the police made of the interrogation.

¶9     At the police station, Defendant was placed in an interrogation room where he remained in total for approximately ninety minutes, including approximately thirty minutes when he was left in the room alone. At the beginning of the interrogation, Officer Tami Kogianes asked Defendant if he could write in English, to which Defendant responded, "Yes." Officer Kogianes gave Defendant an opportunity to provide a written explanation of what happened, but Defendant refused to do so. After leaving Defendant alone for approximately twenty-five minutes, Officers Kogianes and Fore reentered the interrogation room. As the interrogation began, Officer Kogianes asked Defendant if his rights had previously been read to him. Though Defendant told the officer that he had previously been advised of his *Miranda* rights, Officer Kogianes again advised Defendant of his rights—albeit in a fairly quick manner. Officer Kogianes then asked, "Do you wish to speak to me?" Defendant responded in the affirmative.

¶10    Both officers were present throughout the interrogation, but Officer Kogianes did the majority of the questioning. Because of the sexual nature of the questions, Officer Kogianes asked Defendant if he would be more comfortable speaking with a male officer, such as Officer Fore. Defendant responded, "No, I can speak to you." The officers told Defendant that they wanted him to explain his side of the story. During the interrogation, the officers asked questions in English. For the most part, Defendant appeared to understand the officers' use of the English language and responded appropriately to the officers' questions.

¶11    In response to questions, Defendant stated that he had not touched the victim's genitals, had not touched her breasts under her shirt, and had not removed either his or her pants. However, he stated that he had touched the victim's breasts on top of her shirt, touched her shoulders, tried to kiss her, and grabbed her hand when she tried to slap him. Defendant did not answer when Officer Kogianes asked him if he had an erection. When Officer Kogianes finally told him the specifics of the victim's allegations, Defendant did not change any of the details of the story he reported to the officers. Defendant also told the officers that he had not previously had a sexual relationship with the victim and that she was angry with him. Following the interrogation, the State charged Defendant with attempted rape, forcible sexual abuse, sexual battery, and domestic violence in the presence of a child.

IV. Motion to Suppress

¶12    Before trial, Defendant moved to suppress the statements he made to the officers, alleging that the officers failed to properly advise him of his *Miranda* rights in the Russian language and failed to ensure that Defendant had knowingly and voluntarily waived his *Miranda* rights before questioning him.  Both the written motion and Defendant's trial counsel's arguments during the suppression hearing focused on whether Defendant sufficiently understood the *Miranda* rights that were given to him in English.  In granting Defendant's motion, the court stated,

> Noting the record in this matter, as a whole, the [c]ourt is unpersuaded that the State has met its burden in establishing that [D]efendant knowingly and voluntarily waived his *Miranda* rights before questioning by officers, and particularly the legal significance of such rights as to an uninformed alien and, therefore, the [c]ourt grants the defendant's motion and the statements made by him to the officers are suppressed.

¶13    The court asked Defendant's trial counsel to prepare a written order setting forth the court's ruling.  However, no such order appears in the record.  After the ruling, the State informed the trial court and Defendant that if Defendant's testimony at trial differed from the statements he had given to officers, the State intended to use those statements in an effort to impeach Defendant at trial.  *See generally State v. Troyer*, 910 P.2d 1182, 1190 (Utah 1995) ("With regard to the State's ability to introduce [the defendant]'s statements into evidence for the sole purpose of impeaching his credibility, the United States Supreme Court has held that 'although statements taken in violation of only the prophylactic *Miranda* rules may not be used in the prosecution's case in chief, they are admissible to impeach conflicting testimony by the defendant.'" (quoting *Michigan v. Harvey*, 494 U.S. 344, 350-51 (1990))).

### V.  Jury Trial, Cross-Examination of the Victim, and Defendant's Decision Not to Testify

¶14    A jury trial was held in December 2008.  The State presented testimony from the victim, an officer, and Defendant's supervisor at McDonald's.  Although the victim's version of events was the only one given at trial, Defendant's trial counsel challenged the victim's general credibility and trial testimony during a thorough cross-examination.

¶15 Defendant's trial counsel's cross-examination revisited the victim's living arrangement and relationship with Defendant. The victim acknowledged that she had decided to move in with Defendant despite being aware of his romantic feelings and that she accepted his gifts throughout their relationship. The victim agreed that she was not fearful of being in Defendant's presence and that she allowed her children to establish a close relationship with him. The victim also acknowledged the sexually-suggestive content of some text messages she exchanged with Defendant and that she had never sought a protective order due to her concern that such an order may have a negative impact on Defendant's immigration status.

¶16 During cross-examination, Defendant's trial counsel questioned the victim about her version of events but focused on the events surrounding the attack rather than on the attack itself. For example, Defendant's trial counsel asked the victim to verify what time Defendant arrived, what he said before she allowed him to enter her residence, why the victim let him in rather than calling the police, and why she would let him in with her children present. Defendant's trial counsel also asked the victim to verify which person led up the stairs and why she did not call the police when Defendant refused to leave the bedroom where her children were sleeping. Defendant's trial counsel questioned the victim about whether her two children in the king-sized bed slept through the encounter. In response to counsel's questions, the victim explained the location of her cell phone during the attack and what she told the dispatcher when she called to request help. Finally, the victim explained that Defendant opened the door and waited for the police to arrive and that she made a statement to the police when they arrived.

¶17 After the State rested, Defendant's trial counsel informed the trial court that after a lengthy conversation with Defendant, "he . . . opted not to testify." The trial court then inquired whether trial counsel had advised Defendant of his right to testify. In response, Defendant's trial counsel stated,

> Yes, this is completely his decision. I could never tell him yes or no in terms of testifying. That's his choice. I can advise him on it, but it's ultimately his choice. I can never refuse to put him on or force him to take the stand and so he and I have discussed it and he's decided . . . not to testify.

The court then questioned Defendant directly to determine if counsel had advised him of his right to testify and whether Defendant had decided not to do so. The Defendant responded "yes" to each question.

¶18 The defense called only one witness at trial—Defendant's roommate. The roommate testified that for several months he lived with the victim, her children, and Defendant, who had been the roommate's friend prior to the two becoming roommates. The roommate also testified that generally the victim was happy to accept Defendant's frequent gifts but sometimes refused them. The roommate testified that on a few occasions the victim, her children, and Defendant would go to McDonald's together and that the roommate sometimes joined them. The roommate stated that the victim and Defendant had a pretty good relationship but sometimes they argued and other times playfully hit each other. The roommate's only testimony regarding the attack was that he had dropped Defendant off at the victim's apartment and later received a text from the victim asking the roommate to come and get Defendant. The roommate also testified that the victim had told him that she did not want to press charges against Defendant. On cross-examination, the roommate acknowledged that while he lived with Defendant and the victim, the roommate never saw them kiss or hold hands. The roommate also explained that he shared a car with Defendant and that when the roommate had the car, the victim would provide transportation for Defendant in her car.

## VI. Closing Arguments

¶19 Defendant's closing argument focused on whether the jury should believe the victim's version of events. Defendant's trial counsel stated, "[I]f you have any doubts as to th[e] relationship as [the victim] has described it to you, then I argue to you [that] you can have doubts as to her explanation or description as to what she claimed happened that night." Defendant's trial counsel argued that the victim's characterization of the prior relationship between the two was unbelievable because Defendant had assisted the victim in moving out, the victim allowed Defendant to spend time with her children, and the victim had not immediately informed Defendant when she married. Defendant's trial counsel also argued that no physical evidence corroborated the victim's version of a violent and vicious attack, other than one bruise; that the victim had not initially told Officer Greening that the victim's seven-year-old child woke up during the attack; that the victim would not have waited for the police with her door open and Defendant outside if he had just attacked her; that the victim had not called the police earlier; and that it would be difficult for Defendant to hold the

victim's "hands together and simultaneously be[] able to pull down her pants, be[] able to touch her, be[] able to do all these things while he's holding her down."

¶20     In rebuttal, the State argued that it was physically possible for a strong man like Defendant to hold this victim down and rather quickly do the things she described. The State further argued that the victim did not want Defendant to get into trouble but wanted him out of her apartment and that Defendant was able to stay in the victim's life because he continued to support her financially.

¶21     During its closing argument, the State made three statements that Defendant now challenges on appeal. In the first challenged statement (the punch statement), the State declared,

> Commission of domestic violence in front of a child is [jury instruction] No. 10. All of these [of]fenses are domestic violence offenses and an assault is a domestic violence offense. By grabbing her and holding her down against her will, by *punching her* and causing this bruise, he can also commit an assault which we did not charge because that is part of the other offenses as well.

(Emphasis added.) In the second challenged statement (the future harm statement), the State commented,

> [Defense counsel] closed by saying that this is an important event in [Defendant]'s life. Please don't forget there [are] two other parties here coming before you seeking justice. [The victim] that was brutally and offensively attacked in this matter, touched in a way, an offensive way that nobody should have to go through. I don't care if you're a woman. I don't care if you're a man. Nobody should have to be touched in a way like this. She's coming here for justice as well and asking for you to see it for what it is and understand, again, this is not TV. We deal with people that live dysfunctional lives and are vulnerable, terribly, terribly, vulnerable to be taken advantage of by somebody like [Defendant].

Second is the State. This is an individual that brazenly has done this, arrogantly done this and does other things arrogantly. This is an individual that the State is deeply concerned is going to do this again, potentially do this again, not learn from his mistakes. I can't do anything to change [the victim's] situation other than counseling, but I have a duty and what the judicial system is about is to make sure that he is diverted in his life, his behaviors so this doesn't happen again and that's what a conviction is about. Thank you.

Finally, in the third challenged statement (the crisis statement), the State argued,

Why in the world would [the victim] want to make up something to put herself through this ordeal? Why in the world would she need to say anything else happened other than he hit me, he held me down? It's a crime in Utah to be in somebody's house and then be told to get out and refuse to do that with the intent to commit any type of crime. Even holding her down would be a bigger offense. No reason for her to push everything in her life to crisis to say something happened that didn't.

¶22 After the jury had left to begin deliberating, Defendant's trial counsel stated,

I wanted to make an objection to [the State]'s closing argument, the very end of the closing argument. [The State] commented on preventing this from happening again for [Defendant]. [The State] was suggesting future behavior for [Defendant]. I argue that's improper argument. It's i[n]flammatory and I would just make an objection for the record on that.

The State asked for permission to respond to Defendant's trial counsel's objection. The court stated that it believed that the objection was waived but allowed the State to respond. The State then commented,

> Well, and I think just on the record it might be beneficial.
> The only reason I went into that was because [Defendant's
> trial counsel] asked to consider the consequences to this man
> and the future impact. The only reason I mentioned that is
> because she raised that issue to consider the impact on those
> two other issues.

The court responded, "All right. Your record is noted." Then the court asked, "Do we have any other legal questions or concerns?" To which Defendant's trial counsel responded, "No, I just wanted to make a record of that objection."

## VII. Conviction and Sentence

¶23    The jury found Defendant guilty of attempted rape, *see* Utah Code Ann. § 76-5-402 (2008); *id.* § 76-4-101; two counts of forcible sexual abuse, *see id.* § 76-5-404; and domestic violence in the presence of a child, *see id.* § 76-5-109.1(2)(c). The jury found Defendant not guilty on the charge of sexual battery, *see id.* § 76-9-702(3). Following the trial, Defendant's trial counsel withdrew and post-trial counsel was appointed, who represented Defendant through his sentencing in March 2009.

## VIII. Appeal and Rule 23B Remand

¶24    Following sentencing, Defendant appealed his convictions through his present counsel (appellate counsel) and claimed, inter alia, that his trial and post-trial counsel performed ineffectively when they failed to properly investigate and present evidence about "whether [Defendant]'s left arm was impaired at the time of the alleged assault" and when they "fail[ed] to prepare findings of fact and conclusions of law concerning the scope of the trial court's ruling on [Defendant]'s motion to suppress." On Defendant's motion, this court remanded the case to the district court (the 23B court) pursuant to rule 23B of the Utah Rules of Appellate Procedure to make findings about trial and post-trial counsel's alleged "fail[ure] to investigate and/or present evidence concerning . . . [Defendant's] left arm." *See generally* Utah R. App. P. 23B(a), (c), (e). This court expressly denied Defendant's request for a 23B hearing on Defendant's ineffective assistance claim related to the motion to suppress.

¶25    Upon remand, the parties conducted discovery, and a new judge was assigned to the case after the original judge recused due to a conflict with the State's expert. On July 8, 2010, the 23B court held a hearing to determine what evidence would be allowed

at the 23B hearing.  Although not within the scope of the 23B remand, during this hearing, Defendant's appellate counsel urged the 23B court to address the scope of Defendant's motion to suppress, including the voluntariness of Defendant's confession. Despite its recognition that it was going beyond the scope of the remand, the 23B court addressed this issue.  The 23B court determined that the motion to suppress addressed only whether Defendant knowingly and voluntarily waived his *Miranda* rights but did not otherwise address the voluntariness of Defendant's statements to the officers. Additionally, based upon its review of the recorded interrogation, the 23B court determined that Defendant was not coerced into answering the officers' questions in violation of his Fifth Amendment rights but instead voluntarily gave his statement to the officers.

¶26    The following day, before the evidence was presented, the 23B court addressed the State's proposed use of Defendant's statements made during the interrogation to impeach Defendant's expert, Dr. Rothfeder.  As the 23B court was unclear about the scope of this expert's proposed testimony, the 23B court presented the parties two alternative rulings on the issue of impeachment.  First, the 23B court relied on *James v. Illinois*, 493 U.S. 307 (1990), to determine that Defendant's statements could not be used to impeach the expert's testimony if the expert testified regarding his own observations of Defendant.  *See id.* at 310, 320.  Second, the 23B court relied on *Wilkes v. United States*, 631 A.2d 880 (D.C. Cir. 1993), *cert. denied*, 115 S. Ct. 143 (1994), to determine that

> if [the expert's] assessment of . . . [D]efendant's condition or
> whatever [the expert] testif[ies] about is based on statements
> that [Defendant] makes or made to [the expert] about
> [Defendant's] physical condition at the time of the events
> that led to this trial, and the [expert has] relied upon . . .
> [D]efendant's statements about his condition at that time, . . .
> the State would be allowed to bring in . . . [D]efendant's
> statements to impeach [Defendant's] statements made to the
> doctors and to clarify the [expert's] testimony about their
> reliance upon those statements and the[ ] expert['s] opinion
> as to . . . [D]efendant's physical state at that time.

*Cf. id.* at 890-91 ("[W]hen a defendant offers the testimony of an expert in the course of presenting an insanity defense and the expert's opinion is based, to any appreciable extent, on statements made to the expert by the defendant, the government may offer

evidence excluded under *Miranda*."). Because of this ruling, Dr. Rothfeder did not testify at the 23B hearing.

¶27    The 23B court then spent three days taking evidence and listening to testimony regarding Defendant's claim that his attorneys conducted inadequate investigations into a possible defense, i.e., his arm injury. The 23B court issued detailed findings upon which it based its conclusion that both trial and post-trial counsel's "representation did not fall below an objective standard of reasonableness."

ISSUES AND STANDARDS OF REVIEW

¶28    Defendant first claims that his convictions should be reversed because the State made three improper statements during its closing argument. "We review a trial court's handling of claimed prosecutorial misconduct for an abuse of discretion." *State v. King*, 2010 UT App 396, ¶ 13, 248 P.3d 984. To the extent that Defendant did not preserve his claims before the trial court, he must establish plain error, ineffective assistance of counsel, or exceptional circumstances to warrant review by this court. *See State v. Low*, 2008 UT 58, ¶ 19, 192 P.3d 867. Each basis for such review of an unpreserved issue presents a legal question that we review for correctness. *See State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 162 ("An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law."); *State v. Candedo*, 2008 UT App 4, ¶ 9, 176 P.3d 459 (mem.) (determining as a matter of law whether the exceptional circumstances exception applied), *aff'd*, 2010 UT 32, ¶ 2, 232 P.3d 1008; *State v. Smit*, 2004 UT App 222, ¶ 7, 95 P.3d 1203 ("Plain error is a question of law reviewed for correctness.").

¶29    Defendant also claims that both his trial and post-trial counsel performed ineffectively by failing to adequately investigate his arm injury and that his trial counsel performed ineffectively by failing to clarify the scope of the motion to suppress before advising him not to testify or by failing to request that his statements be suppressed because they were involuntarily made in violation of his Fifth Amendment rights provided by the United States Constitution. Defendant's claim "presents a question of law" that we review for correctness. *See Clark*, 2004 UT 25, ¶ 6. However, if a trial court has previously reviewed the ineffective assistance of counsel claim, an appellate court is "free to make an independent determination of a trial court's conclusions[, though t]he factual findings of the trial court . . . shall not be set aside on appeal unless clearly erroneous." *State v. Templin*, 805 P.2d 182, 186 (Utah 1990) (citations omitted).

¶30    Finally, Defendant argues that the 23B court made significant legal and factual errors. We review the 23B court's factual findings for clear error and its legal conclusions for correctness. *See id.*


ANALYSIS

I. Prosecutorial Misconduct Claim

¶31    Defendant asserts that the State made three improper statements during its closing argument. According to Defendant, the improper statements constitute prosecutorial misconduct, which requires reversal.

A. Preservation

¶32    "We generally will not consider an issue unless it has been preserved for appeal. An issue is preserved for appeal when it has been 'presented to the district court in such a way that the court has an opportunity to rule on [it].'" *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (alteration in original) (citations omitted). "This requirement puts the trial judge on notice of the asserted error and allows for correction at that time in the course of the proceeding." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 51, 99 P.3d 801. "For a trial court to be afforded an opportunity to correct the error '(1) the issue must be raised in a timely fashion[,] (2) the issue must be specifically raised[,] and (3) the challenging party must introduce supporting evidence or relevant legal authority.'" *Id.* (alterations in original) (quoting *Brookside Mobile Home Park, Ltd. v. Peebles*, 2002 UT 48, ¶ 14, 48 P.3d 968). "Issues that are not raised at trial are usually deemed waived." *See id.*

¶33    "While we generally will not examine the State's closing argument [for misconduct] if the defendant failed to timely object to it, we will do so if the defendant states that the failure to object was due to ineffective assistance of counsel," *State v. Nelson-Waggoner*, 2004 UT 29, ¶ 30, 94 P.3d 186 (citation omitted), plain error on the part of the trial court, *see State v. Calliham*, 2002 UT 86, ¶ 62, 55 P.3d 573, or exceptional circumstances. *See State v. Low*, 2008 UT 58, ¶ 19, 192 P.3d 867.

¶34    Defendant clearly did not preserve his prosecutorial misconduct claims for either the punch statement or the crisis statement. As for the future harm statement,

Defendant did not sufficiently preserve the arguments he now makes on appeal because he did not make a timely objection, *see 438 Main St.*, 2004 UT 72, ¶ 51, did not request that the court rule on his objection, and did not request the specific relief he now requests on appeal, *see State v. Briggs*, 2006 UT App 448, ¶ 4, 147 P.3d 969 (mem.) ("Utah courts require specific objections in order to bring all claimed errors to the trial court's attention to give the court an opportunity to correct the errors if appropriate. Although [the d]efendant brought the alleged violation . . . to the court's attention, by failing to state a legal basis for his objection or request any specific relief, [the d]efendant did not give the court an opportunity to correct the error[]." (third alteration in original) (citation and internal quotation marks omitted)). Thus, we review Defendant's challenges to the prosecutor's statements only if Defendant can establish plain error, ineffective assistance of counsel, or exceptional circumstances. *See Low*, 2008 UT 58, ¶ 19

¶35 "To prevail under plain error review, a defendant must demonstrate that [1] an error exists; [2] the error should have been obvious to the trial court; and [3] the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome." *Id.* ¶ 20 (alterations in original) (internal quotation marks omitted). The next exception to the preservation requirement is where trial counsel's failure to preserve the issue in the trial court is the result of ineffective assistance of counsel. *See id.* ¶ 19. The establishment of ineffective assistance of counsel requires a showing (1) that counsel's failure to preserve the issue fell below an objective standard of reasonable professional judgment and (2) that counsel's deficient performance was prejudicial. *See State v. Munguia*, 2011 UT 5, ¶ 13, 253 P.3d 1082. The last exception to the preservation requirement involves "exceptional circumstances, [which] is a concept that is used sparingly, and properly reserved for truly exceptional situations, for cases . . . involving rare procedural anomalies." *State v. Alfatlawi*, 2006 UT App 511, ¶ 44, 153 P.3d 804 (omission in original) (internal quotation marks omitted); *see also State v. Dunn*, 850 P.2d 1201, 1209 n.3 (Utah 1993). "Furthermore, the exceptional circumstances doctrine is 'reserv[ed] for the most unusual circumstances where our failure to consider an issue that was not properly preserved for appeal would have resulted in manifest injustice.'" *Alfatlawi*, 2006 UT App 511, ¶ 44 (alteration in original) (citation omitted).

¶36 First, the challenges Defendant has raised to the three statements do not fit the narrowly defined exceptional circumstances exception, and we will not consider this exception further. *See id.*; *see also State v. Carter*, 776 P.2d 886, 888 (Utah 1989) ("[An appellate court] need not analyze and address in writing each and every argument, issue, or claim raised and properly before [the court] on appeal. Rather, it is a maxim of

appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court.").

¶37     Second, while they are different concepts, to prevail on appeal, both plain error and ineffective assistance of counsel require a showing that the error or deficiency of which Defendant complains resulted in harm to Defendant.  *See Low*, 2008 UT 58, ¶ 43 ("'Th[e] harmfulness test [in a plain error analysis] is equivalent to the prejudice test applied in assessing claims of ineffective assistance of counsel.'" (citation omitted)). Likewise, to establish prosecutorial misconduct, Defendant must prove both that "the [prosecutor's] remarks call[ed] to the [jury's] attention . . . matters which they would not be justified in considering in determining their verdict, and" that the jury, "under the circumstances of the particular case, [was] probably influenced by those remarks." *State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628 (internal quotation marks omitted).  Thus, to determine if the relevant exceptions to the preservation rule apply to allow our review of the alleged errors and when considering a prosecutorial misconduct claim in the first instance, the defendant must be able to show prejudice to prevail.

¶38     Under the facts of this case, Defendant cannot meet that burden with respect to either the punch statement or the future harm statement and cannot establish that the crisis statement was so improper that such impropriety would be obvious to the trial court or that counsel's failure to timely object demonstrated deficient performance.

B.  No Prejudice Established for the Punch or Future Harm Statements

    1.  The Punch Statement

¶39     Defendant asserts that the State misrepresented the evidence by claiming that Defendant bruised the victim by *punching* her.  The State concedes that no evidence was presented during the trial to support the prosecutor's statement.  Nevertheless, Defendant's prosecutorial misconduct claim fails because he has not demonstrated that this misstatement caused him prejudice.  As discussed above, when considering whether the misstatement should have been obvious to the trial court or whether Defendant's trial counsel's failure to timely object qualifies as ineffective assistance of counsel, Defendant must show that he was prejudiced.  *See State v. Low*, 2008 UT 58, ¶ 43, 192 P.3d 867; *see also Ross*, 2007 UT 89, ¶ 17 (explaining the requirements to establish a plain error claim); *State v. Kelley*, 2000 UT 41, ¶ 25, 1 P.3d 546 (explaining the requirements to establish an ineffective assistance of counsel claim).

¶40    We are persuaded that Defendant was not prejudiced by the "punch" misstatement for two reasons.  First, the jury heard the evidence at trial and was aware that any bruising the victim suffered was alleged to have come from a pinch rather than from a punch. Importantly, the jury was instructed that "arguments of lawyers are not evidence."  The jury instructions stated that closing arguments "are not evidence but are given to assist you in evaluating the evidence.  The attorneys also are permitted to argue, to characterize the evidence, and to attempt to persuade you to a particular verdict.  You may accept or reject those arguments as you see fit."  Thus, because the jury had only heard evidence that the victim's bruising could have been caused by a pinch,[6] and the jury was instructed that the State's closing argument were not evidence, we cannot say that Defendant was prejudiced by the State's misstatement.

¶41    Second, to find him guilty of the charged offenses, the jury was not required to find that Defendant caused the victim any particular bodily injury.  In fact, causing bodily injury was not an element the State was required to prove to convict Defendant of attempted rape, forcible sexual abuse, or even domestic violence in the presence of a child.  The attempted rape charge required the jury to find that Defendant took a substantial step toward and intended to have nonconsensual sexual intercourse with the victim.  *See* Utah Code Ann. § 76-5-402(1) (2008) (rape); *id.* § 76-4-101(1) (attempt).  The forcible sexual abuse convictions required the jury to find that Defendant "touche[d] the anus, buttocks, or any part of the genitals of another, or touche[d] the breast" of the victim without her consent and "with [the] intent to cause substantial emotional or bodily pain . . . or . . . to arouse or gratify [his] sexual desire."  *See id.* § 76-5-404(1).  Moreover, attempted rape and forcible sexual abuse are each a qualifying domestic violence offenses pursuant to the definition of "domestic violence."  *See* Utah Code Ann. § 77-36-1(4) (Supp. 2011);[7] Utah Code Ann. § 76-5-109.1(2)(c) (2008).  The jury found that Defendant committed attempted rape and forcible sexual abuse and that the State proved that children were present in the same bedroom where those acts

---

6. Although Defendant did not object to the statement at the time it was made by the State, counsel did respond during her closing argument that the bruise came from a pinch and that the jury should examine the photographs received as evidence during the trial to determine if the bruise was caused the night of the alleged attack.

7. Although other portions of this statute were amended in 2010 and 2011, the definition of domestic violence did not change from the previous version in effect at the time of Defendant's actions.  *See* Utah Code Ann. § 77-36-1 amendment notes (Supp. 2011).  We cite the current version for the reader's convenience.

occurred. Thus, the evidence that Defendant bruised the victim, whether by pinch or by punch, was not necessary to prove any of the elements of the charged offenses. Therefore, any misstatement by the State that Defendant punched the victim rather than pinched her was not prejudicial.

## 2. The Future Harm Statement

¶42    As Defendant has recognized, the future harm statement was by far the most egregious statement the State made during its closing argument.  However, even if we assume that Defendant preserved his challenge to this statement and that he could demonstrate that the statement was improper,[8] we agree with the State that the statement was harmless beyond a reasonable doubt.[9]  *See State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628.

¶43    In reviewing whether the jury was influenced by the statement, we consider "the circumstances of the case as a whole."  *See State v. Troy*, 688 P.2d 483, 486 (Utah 1984). In our review, we may consider the strength of the evidence against Defendant, when and under what circumstances the statement was made, whether defense counsel had an opportunity to respond to the improper statement, the purpose of the statement and

8.           "The test of whether the remarks made by counsel are so objectionable as to merit a reversal in a criminal case is, did the remarks call to the attention of the jurors matters which they would not be justified in considering in determining their verdict, and were they, under the circumstances of the particular case, probably influenced by those remarks."
*State v. Ross*, 2007 UT 89, ¶ 54, 174 P.3d 628 (citation omitted).

9. Under the plain error and ineffective assistance of counsel claims, Defendant has the burden to show that the error was prejudicial.  *See State v. Calliham*, 2002 UT 86, ¶ 62, 55 P.3d 573; *State v. Kelley*, 2000 UT 41, ¶ 25, 1 P.3d 546; *cf. Ross*, 2007 UT 89, ¶ 54 (stating that to establish prosecutorial misconduct the defendant must prove, inter alia, that the jury, "under the circumstances of the particular case, [was] probably influenced by th[e prosecutor's improper] remarks").  However, "[i]f prosecutorial misconduct is established, the State must show that the error was harmless beyond a reasonable doubt." *Ross*, 2007 UT 89, ¶ 54.  It follows that if the State can "show that the error was harmless beyond a reasonable doubt," *see id.*, Defendant would be unable to establish that the error was prejudicial.

its effect on the issues in the case, and "whether the trial court gave a curative instruction," *State v. King*, 2010 UT App 396, ¶ 23, 248 P.3d 984 (internal quotation marks omitted). *See also Ross*, 2007 UT 89, ¶¶ 54, 57-58.

¶44   We conclude that the future harm statement was not prejudicial because, as the State argues, the statement could not have negatively impacted the jury. *See Ross*, 2007 UT 89, ¶ 54. By the very nature of the statement, if the jury did not believe that Defendant had committed the charged offenses in this instance, there would be no reason for the jury to find him guilty solely to prevent him from committing similar acts in the future.

¶45   Defendant argues that the future harm statement was prejudicial because the evidence against him, consisting mainly of the victim's incredible testimony, was weak. "'If proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial.' Likewise, in a case with less compelling proof, this Court will more closely scrutinize the conduct." *Troy*, 688 P.2d at 486 (citation omitted). Although Defendant attacked the victim's general credibility, the victim's testimony about Defendant's actions during the attack, which was the basis for the convictions, was unchallenged by any conflicting testimony regarding the events. Furthermore, the victim's testimony of related events strongly supports the convictions. Therefore, we determine that the State presented strong evidence that Defendant committed the charged offenses.

¶46   Although Defendant did not have an opportunity to respond to the statement because it was made in the State's rebuttal closing argument, the future harm statement was made in response to Defendant's plea to the jury to consider the effect that a conviction would have on Defendant's life. Furthermore, the discussion about future harm to either Defendant or the victim did not impact what was contested at trial and what was required to be proven by the State beyond a reasonable doubt. *See Ross*, 2007 UT 89, ¶ 57 (evaluating prejudice in a prosecutorial misconduct claim by considering whether the remarks addressed "the main issue in the case"). Finally, as discussed with the punch statement, the jury was instructed that closing arguments were not evidence and could be accepted or rejected by the jury.[10] *See King*, 2010 UT App 396, ¶ 23

---

10. Defendant argues that because the jury instructions allowed jurors to consider a

(continued...)

(evaluating prejudice in a prosecutorial misconduct claim by considering, inter alia, "whether the trial court gave a curative [jury] instruction"). Therefore, under the circumstances of this case, any error was harmless beyond a reasonable doubt.

C. The Crisis Statement

¶47 Defendant next argues that the State's closing argument was improper because there was no direct evidence presented at trial to support the State's argument that the victim had "[n]o reason . . . to push everything in her life to crisis to say something happened that didn't." In reviewing statements made during closing arguments, the supreme court has recognized,

> Our review of a prosecutor's conduct must also take into account that "[a] prosecutor has the duty and right to argue the case based on the 'total picture shown by the evidence or the lack thereof.'" Furthermore, "[c]ounsel for both sides have considerable latitude in their closing arguments. They have the right to fully discuss from their perspectives the evidence and all inferences and deductions it supports."

*State v. Ross*, 2007 UT 89, ¶ 55, 174 P.3d 628 (alterations in original) (citations omitted).

¶48 Even though the victim did not directly state that her life had been pushed into a crisis as a result of the sexual assault allegations she made against Defendant, the State's crisis remark was a reasonable inference about the victim's situation given the evidence that was presented at trial. Crisis is defined as "an emotionally significant event or radical change of status in a person's life"; "an unstable or crucial time or state of affairs

---

10. (...continued)
lawyer's statements as evidence if they were based on stipulations and because the jury was not instructed on what a stipulation was, the jury could have thought the State's statement was a stipulation. However, Defendant does not address the separate jury instruction that discussed closing arguments and instructed the jury that statements made in closing arguments were not evidence, but rather the lawyer's interpretation of the evidence. Additionally, Defendant did not preserve this issue nor has he addressed the issue on appeal.

in which a decisive change is impending[,] *especially*[] one with the distinct possibility of a highly undesirable outcome"; or "a situation that has reached a critical phase." *Merriam-Webster Collegiate Dictionary*, 296 (11th ed. 2003) *available at* http://www.merriam-webster.com/dictionary/ crisis.

¶49    Although the victim never directly testified that her life was in crisis, the jury could reasonably infer from the evidence, and the State could legitimately comment, that the victim's claim of sexual assault was a significant event in her life.  The victim testified that she had moved in with Defendant because she "didn't have a place to live," and continued living with Defendant "because [she] didn't have a place to live, [she] wasn't financially stable, so . . . [she] needed a place to stay for [her] kids."  After moving out, she continued to rely on Defendant financially and her children continued to have a close relationship with Defendant.  It is reasonable to assume that the victim's allegations that Defendant sexually assaulted her would cause him to sever his financial and emotional support for the victim and her children.  Thus, making the allegation and testifying at Defendant's trial could reasonably have been interpreted by the State as pushing the victim's life into crisis.[11]  Because the State's statement was a reasonable interpretation of the victim's testimony, Defendant cannot establish that the court plainly erred or that his counsel was ineffective for not objecting to the statement.  *See State v. Calliham*, 2002 UT 86, ¶ 62, 55 P.3d 573 (stating that the defendant must show, inter alia, "that the prosecutor's comments were so obviously improper that the trial court had an opportunity to address the error"); *State v. Kelley*, 2000 UT 41, ¶ 25, 1 P.3d 546 (requiring a defendant's "counsel [to] render[] a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment" to establish the first element of ineffective assistance of counsel).[12]

---

11.  Because we conclude that the statement was not improper, we do not address whether the statement was prejudicial.

12.  Because of our decision, we do not address Defendant's cumulative error argument or his ineffective assistance of counsel claim for his post-trial counsel's failure to file a motion to arrest judgment for Defendant's trial counsel's failure to object to the State's statements made during closing arguments.

## II. Ineffective Assistance of Counsel Claim Regarding Defendant's Right to Testify

¶50    Defendant argues that his trial counsel performed ineffectively because counsel failed to seek clarification from the trial court about the scope of the motion to suppress before advising him not to testify at trial.  In particular, Defendant asserts that counsel did not clarify whether the trial court granted the motion based on Defendant's failure to knowingly and voluntarily waive his *Miranda* rights or because Defendant's statements to police were the product of coercion in violation of his Fifth Amendment rights.  In the alternative, Defendant argues that if the motion to suppress was not based on the involuntariness of his statements, trial counsel was ineffective for not making a request to the trial court for such determination.

¶51    To establish ineffective assistance, Defendant must prove two elements. Defendant must first establish "that his counsel rendered a deficient performance in some demonstrable manner, which performance fell below an objective standard of reasonable professional judgment."  *Kelley*, 2000 UT 41, ¶ 25 (internal quotation marks omitted).  "To satisfy the first part of the test, defendant must overcome the strong presumption that [his] trial counsel rendered adequate assistance by persuading the court that there was *no conceivable tactical basis* for counsel's actions."  *State v. Clark*, 2004 UT 25, ¶ 6, 89 P.3d 1008 (emphasis and alteration in original) (internal quotation marks omitted).  In the seminal case on ineffective assistance of counsel, *Strickland v. Washington*, 466 U.S. 668 (1984), the United States Supreme Court cautioned,

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . .  [Thus,] a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Id.* at 689 (internal quotation marks omitted); *accord State v. Litherland*, 2000 UT 76, ¶ 19, 12 P.3d 92.  Furthermore, defense counsel is not required to make futile motions.  *See*

*State v. Chacon*, 962 P.2d 48, 51 (Utah 1998) ("Neither speculative claims nor counsel's failure to make futile objections establishes ineffective assistance of counsel.").

¶52  The second element in an ineffective assistance of counsel claim is "that counsel's performance prejudiced the defendant," i.e., there is "a reasonable probability . . . that except for ineffective counsel, the result would have been different." *Kelley*, 2000 UT 41, ¶ 25 (internal quotation marks omitted).

> "A reasonable probability is a probability sufficient to undermine confidence in the outcome." In making this determination, an appellate court should consider the totality of the evidence, taking into account such factors as whether the errors affect the entire evidentiary picture or have an isolated effect and how strongly the verdict is supported by the record.

*State v. Templin*, 805 P.2d 182, 187 (Utah 1990) (quoting *Strickland*, 466 U.S. at 694).

¶53  In this case, it would have been important for Defendant's trial counsel to determine whether the trial court suppressed Defendant's statements to police because they were improperly coerced in violation of his Fifth Amendment rights[13] or because

---

13. With regard to a Fifth Amendment violation, the court looks at the totality of the circumstances "[t]o determine whether a suspect's statements were coerced." *See State v. Troyer*, 910 P.2d 1182, 1188 (Utah 1995).

they were taken in violation of his *Miranda* rights[14] so that defense counsel would know whether the statements could be used to impeach Defendant if he testified.

> Statements made by a defendant in circumstances violating the strictures of *Miranda* . . . are admissible for impeachment if their "trustworthiness . . . satisfies legal standards." But *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law, "even though there is ample evidence aside from the confession to support the conviction."

*Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978) (second omission in original) (citations omitted); *accord State v. Troyer*, 910 P.2d 1182, 1190 (Utah 1995) ("With regard to the State's ability to introduce [the defendant]'s statements into evidence for the sole purpose of impeaching his credibility, the United States Supreme Court has held that 'although statements taken in violation of only the prophylactic *Miranda* rules may not be used in the prosecution's case in chief, they are admissible to impeach conflicting testimony by the defendant.'" (quoting *Michigan v. Harvey*, 494 U.S. 344, 350-51 (1990))).

A. Defendant's Motion to Suppress Only Addressed a *Miranda* Violation.

¶54    We agree with the 23B court's determination that the motion to suppress and the trial court's ruling on that motion were based solely on the question of whether

---

14.                With regard to the initial waiver of *Miranda* rights, th[e Utah Supreme C]ourt has noted, in accordance with federal case law, that a heavy burden rests on law enforcement officers to demonstrate that the defendant knowingly and intelligently waived his *Miranda* rights. The burden therefore rests on the State to show that a suspect's waiver of *Miranda* rights was clear and unambiguous, as well as voluntary.

*State v. Tiedemann*, 2007 UT 49, ¶ 16, 162 P.3d 1106 (internal quotation marks omitted); *see also State v. Barrett*, 2006 UT App 417, ¶¶ 12-13, 147 P.3d 491 (determining that the defendant knowingly, intelligently, and voluntarily waived his *Miranda* rights).

Defendant knowingly waived his *Miranda* rights.[15] Defendant's motion focused mainly on the police officers' failure to properly advise Defendant of his *Miranda* rights in Russian or to ensure that Defendant clearly understood his *Miranda* rights. In granting the motion, the court found only that Defendant was not adequately informed of his *Miranda* rights.

¶55    On appeal, Defendant claims that his motion to suppress filed in the trial court raised the issue of constitutional voluntariness under the Fifth Amendment because the motion stated,

> It is the prosecutor's burden to establish, by a preponderance of the evidence, that a defendant's statements to officers are voluntarily made. Courts have held that "[o]ne precondition for a voluntary custodial confession is a voluntary waiver of *Miranda* rights, and language difficulties may impair the ability of a person in custody to waive these rights in a free and aware manner."

(Citations omitted.) Our interpretation of Defendant's written motion is that while the motion does mention voluntariness, it does so in the context of *Miranda* and does not provide either a complete legal analysis of the Fifth Amendment requirements or a factual argument that Defendant's statements were coerced in violation of his Fifth Amendment rights. *See Troyer*, 910 P.2d at 1187 ("The United States Supreme Court has held that 'a simple failure to administer *Miranda* warnings is not in itself a violation of the Fifth Amendment.'" (quoting *Oregon v. Elstad*, 470 U.S. 298, 306 n.1 (1985))). The last paragraph of Defendant's motion to suppress reiterated his *Miranda* argument by stating, "Defendant asserts that his statements to officers were not voluntarily made as he did not knowingly and voluntarily waive his *Miranda* rights. Evidence on this point will be provided by Defendant in greater detail at the scheduled Evidentiary Hearing." However, at the hearing on the motion to suppress, Defendant's trial counsel simply

---

15. This court's remand did not include Defendant's request to have the 23B court address the issue of coercion. However, Defendant continually urged the 23B court to address this issue to aid in presenting evidence at the 23B remand hearing. Our review of the record convinces us that the 23B court was correct, for the most part, in both its legal and factual analysis of the *Miranda* and the voluntariness issues.

stated that the motion to suppress was based on the violation of Defendant's *Miranda* rights.

¶56    Thus, it is clear from the record that Defendant's motion to suppress focused only on a violation of his *Miranda* rights.  Although a *Miranda* violation may be considered in a voluntariness analysis, *see id.*, the issue of the voluntariness of Defendant's statements under the Fifth Amendment was not argued or considered. Therefore, Defendant's trial counsel's performance was not deficient in not requesting further clarification concerning the scope of the trial court's suppression ruling because it would have been futile to request that the trial court clarify its already clear ruling. *See State v. Chacon*, 962 P.2d 48, 51 (Utah 1998) ("Neither speculative claims nor counsel's failure to make futile objections establishes ineffective assistance of counsel.").

B.  Defendant's Fifth Amendment Rights Were Not Violated Because His Statements Were Not Coerced.

¶57    Alternatively, Defendant argues that if his trial counsel did not move for suppression based on a violation of his Fifth Amendment rights then his trial counsel was ineffective for failing to make such a request.  Again, we agree with the 23B court that Defendant's statements were not coerced in violation of his Fifth Amendment rights but were instead voluntarily given.  Thus, trial counsel cannot be considered to be ineffective for not making a futile motion.[16]  *See id.*

¶58    As the Utah Supreme Court has explained,

> The Fifth Amendment [to the United States Constitution] protects individuals from being *compelled* to give evidence against themselves.  Accordingly, analysis of whether admission of a confession into evidence violates the Fifth or Fourteenth Amendment does not turn solely on the voluntariness of the confession.  "[C]oercive police activity is a necessary predicate to the finding that a confession is not voluntary."

---

16.  Because of this determination, we do not address Defendant's separate claim that his post-trial counsel was ineffective for not filing a motion to arrest judgment based on Defendant's argument that the statements were involuntary and trial counsel improperly advised him not to testify.

*State v. Rettenberger*, 1999 UT 80, ¶ 11, 984 P.2d 1009 (alterations in original) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)); *see also State v. Troyer*, 910 P.2d 1182, 1188 (Utah 1995) ("'Cases that implicate the Fifth Amendment must, by definition, involve an element of coercion, since the Fifth Amendment protects individuals from being *compelled* to give evidence against themselves.'" (quoting *Michigan v. Tucker*, 417 U.S. 433, 448-49 (1974))).

> [I]n order to determine whether a challenged confession was constitutional under the Fifth and Fourteenth Amendments, a court must examine the totality of circumstances to determine whether a confession had been made freely, voluntarily and without compulsion or inducement of any sort. [T]he totality of circumstances [includes] both the characteristics of the accused and the details of the interrogation. . . . [U]nder the totality of circumstances test, courts must consider such external factors as the duration of the interrogation, the persistence of the officers, police trickery, absence of family and counsel, and threats and promises made to the defendant by the officers.
>
> In addition, as interrogators have turned to more subtle forms of psychological persuasion, courts have found the mental condition of the defendant a more significant factor in the voluntariness calculus. Thus, under the totality of circumstances analysis, courts must also consider such factors as the defendant's mental health, mental deficiency, emotional instability, education, age, and familiarity with the judicial system.

*Rettenberger*, 1999 UT 80, ¶¶ 14-15 (second and third alterations in original) (citations and internal quotation marks omitted).

¶59 In this case, an examination of the external factors surrounding Defendant's interrogation at the police station does not demonstrate that Defendant was coerced into making a statement and answering questions during the interview with the police officers. *See id.* ¶ 14. The entire interrogation lasted less than ninety minutes. Furthermore, we agree with the 23B court that "nothing in the tone of voice of the officers . . . indicated that they were berating him, forcing him to talk to them in

any[ ]way[;] . . . there was [nothing] done to make him uncomfortable, to pressure him"; and "at all times [Defendant] appeared to be comfortable in explaining his answers and in responding to the [officers]."

¶60    Defendant argues that the interrogation was improper because he was not told of the charges that would be filed against him until after the interrogation ended. However, Defendant does not argue that the officers knew what the exact charges were going to be prior to the conclusion of Defendant's interrogation. And even though Officer Fore did not inform Defendant of the charges that were to be filed until the end of the interview, Officer Kogianes told Defendant that he was facing multiple, serious charges and repeatedly explained the importance of Defendant giving his version of events so that they could get to the truth, instead of just relying on the victim's allegations.

¶61    Defendant also claims that the officers overstated the evidence when they claimed the victim had multiple marks on her from the attack, when in fact she had only one bruise. However, by Defendant's own account of events there could have been multiple marks where he admittedly touched the victim. Although the victim had only one bruise that was photographed, the officers may have noticed other more transitory marks where Defendant had touched her. More importantly, the officers' statements regarding the marks on the victim did not change Defendant's version of events from the statements he had already made.

¶62    Defendant also asserts that his statements were not made voluntarily because "police did nothing to secure or offer an interpreter and made no effort to contact anyone from the Russian consulate." For the purposes of determining the voluntariness of a statement, the police were not required to inform Defendant of his right to contact the Russian consulate. *See United States v. Gamez*, 301 F.3d 1138, 1143-44 (9th Cir. 2002) ("Article 36 of the Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77, requires that foreign nationals be informed of their right to contact their consulate upon arrest. However, suppression of statements is not an appropriate remedy for violation of Article 36. Accordingly, the FBI's failure to notify [the defendant] of his right to contact the Mexican Consulate prior to interrogating him is not a valid basis for suppression of his statements."). Additionally, because Defendant indicated that he was able to write, speak, and understand English, the police were not required to provide an interpreter. Thus, although Defendant did not have counsel or family present, the totality of the circumstances indicate that Defendant voluntarily spoke to the police.

¶63   As to the specific characteristics of the Defendant, he had lived in the United States for a year and four months before the interrogation. He had worked at McDonald's, and his supervisor at work testified that Defendant was able to speak and understand English. Defendant does not cite to any evidence that was produced to the trial court or the 23B court that Defendant's "mental health, mental deficiency, [or] emotional instability," *see State v. Rettenberger*, 1999 UT 80, ¶ 15, 984 P.2d 1009, affected the voluntariness of his statements to the officers.

¶64   Therefore, based upon the totality of the circumstances, we determine that Defendant's statements made to the officers were voluntary. Accordingly, Defendant's trial counsel was not ineffective for failing to pursue exclusion of his statements based on a violation of Defendant's Fifth Amendment rights,[17] *see State v. Chacon*, 962 P.2d 48, 51 (Utah 1998), and was not ineffective for failing to clarify the scope of the trial court's ruling before advising him that his statement could be used to impeach him if he testified at trial, *see Mincey v. Arizona*, 437 U.S. 385, 397-98 (1978).

### III. Legal and Factual Determinations of the 23B Court

¶65   Finally, Defendant claims that the 23B court made legal and factual errors in its determination that trial and post-trial counsel effectively pursed their investigation into Defendant's claim of a prior arm injury.[18] We review the 23B court's factual findings for

---

17. Because of this disposition, Defendant's argument that post-trial counsel was ineffective for failing to pursue a remedy for a violation of Defendant's Fifth Amendment rights also fails.

18. The 23B court spent considerable time accepting evidence and was very thorough in its findings and conclusions. We appreciate such diligence. Nevertheless, Defendant claims that the 23B court's analysis of the issues "was not objective and impartial" and did not "consider the entire evidentiary picture of the case." However, the purpose and effect of the 23B remand is not to look at the entire evidentiary picture, as this court will do in an ineffective assistance of counsel claim, *see State v. Templin*, 805 P.2d 182, 187 (Utah 1990), but to "ent[er] findings of fact[] necessary for the appellate court's determination of a claim of ineffective assistance of counsel," Utah R. App. P. 23B(a). *See also id.* R. 23B(e) ("Upon remand the trial court shall promptly conduct hearings and take evidence as necessary to enter the findings of fact necessary to determine the claim of ineffective assistance of counsel. . . . The burden of proving a fact shall be upon the

(continued...)

clear error and its legal conclusions for correctness. *See State v. Templin*, 805 P.2d 182, 186 (Utah 1990).

¶66 The main factual question the 23B court was asked to determine was what efforts Defendant's trial and post-trial counsel made to investigate Defendant's claim that he suffered an arm injury that would have affected his ability to attack the victim in the manner she alleged. Thus, it is critical for our inquiry into Defendant's ineffective assistance claim to determine when Defendant told trial counsel about his arm injury and what she knew about the purported injury.

¶67 During the 23B proceedings, the only testimony about the communications between Defendant and his trial counsel came from trial counsel. Trial counsel's testimony, as was reflected in the 23B court's findings, was that she and Defendant spoke in English and Defendant's "English was 'pretty good'"; that when Defendant first told her of his arm injury it was "'early on' in her representation of" Defendant; that "[s]he understood that the arm injury had occurred in Russia"; that "[t]he second conversation about the injury certainly occurred in the courtroom and may have even occurred during trial—possibly during [the victim]'s testimony"; that trial counsel "was very confused as to when the conversation occurred and could not with any certainty describe when it occurred"; that "[d]uring the second conversation, . . . [D]efendant may have told her that the arm injury had occurred in Russia," and so "[s]he assumed that all of the medical records would be in Russia"; that "[D]efendant never told her that he had been treated for the injury in Utah"; that "[s]he did not contact . . . [D]efendant's parents about any medical records" because Defendant "request[ed] her contact with his parents [be] very limited"; that the roommate "never brought up any issues with . . . [D]efendant's left arm" when trial counsel spoke with him; that trial

---

18. (...continued)
proponent of the fact. The standard of proof shall be a preponderance of the evidence. The trial court shall enter written findings of fact concerning the claimed deficient performance by counsel and the claimed prejudice suffered by appellant as a result, in accordance with the order of remand."). We do not rely solely on the 23B court's summary or legal conclusions; rather, this court is concerned with the facts regarding counsel's performance that are established during the 23B process.

Additionally, we do not consider Defendant's claims that the 23B findings are incomplete because he has failed to indicate where he objected to the completeness of the findings before the 23B court. *See In re K.F.*, 2009 UT 4, ¶ 62, 201 P.3d 985 (outlining the preservation requirements for incomplete findings).

counsel's investigator did not tell her that Defendant ever mentioned an arm injury; that trial counsel "never observed . . . [D]efendant to have any problems with his left arm"; that "[D]efendant never asked her to obtain medical treatment for his arm or complained about any problems with using his arm in his daily life, such as at his employment"; and that "[D]efendant never complained of any pain in his left arm from surgery, numbness in his left hand, problems with the fingers of his left hand, or inability to grip items with his left hand or open doors." Importantly, the court found trial counsel's testimony credible.

¶68 Defendant challenges these findings on appeal. Although Defendant attempts to marshal the evidence, he has not demonstrated that the factual findings are clearly erroneous. *See Friends of Maple Mountain, Inc. v. Mapleton City*, 2010 UT 11, ¶ 12, 228 P.3d 1238 ("'Once appellants have established every pillar supporting their adversary's position, they then must ferret out a fatal flaw in the evidence and show why those pillars fail to support the trial court's findings. They must show the trial court's findings are so lacking in support as to be against the clear weight of the evidence, thus making them clearly erroneous.'" (citation omitted)).

¶69 As for post-trial counsel, Defendant has not demonstrated that the factual findings are clearly erroneous. The 23B court's findings establish that post-trial counsel did investigate the arm injury and that the investigation led him to Defendant's surgeon, whose testimony and notes established that Defendant's arm injury would not have impaired his ability to attack the victim in 2008. Contrary to what Defendant informed his post-trial counsel the surgeon would say, the surgeon actually reported that Defendant had fully healed from the surgery before the attack. The surgeon specifically testified, as indicated in the 23B court's findings, that he "thought that it was 'within a reasonable medical likelihood' that . . . [D]efendant could have performed the acts he was accused of." The surgeon's notes also indicated no complaints from Defendant about his arm after the surgery.

¶70 Based on the 23B court's findings, we must agree with the 23B court that neither trial nor post-trial counsel provided Defendant with ineffective representation. While we agree that "[i]f counsel does not adequately investigate the underlying facts of the case[,] . . . counsel's performance cannot fall within the 'wide range of reasonable professional assistance,'" *State v. Templin*, 805 P.2d 182, 188 (Utah 1990) (citation

omitted), such a deficiency must also be prejudicial,[19] *see id.* at 186. Even assuming that trial counsel did not adequately investigate, Defendant suffered no harm as a result of any less than thorough investigation. When post-trial counsel did investigate, Defendant's surgeon reported that Defendant had fully healed from the injury and surgery.

¶71 Defendant also claims that post-trial counsel's failure to speak with the roommate until just before the 23B hearing suggests that his counsel was ineffective. Even presuming, without deciding, that post-trial counsel's performance was deficient, any error was harmless because the 23B court found that the roommate's testimony regarding Defendant's injury was not credible.

¶72 Defendant also argues that the 23B court incorrectly determined that Defendant's statements to the police could be used to impeach Dr. Rothfeder, the expert Defendant intended to call at the 23B hearing, if Dr. Rothfeder's opinion relied on Defendant's statements as to his condition at the time the offense was committed. We do not reach the merits of this argument. First, Defendant has not established how Dr. Rothfeder would have helped establish the critical information about when trial counsel was informed of Defendant's arm injury. Second, though Defendant is correct that a defendant's suppressed statements cannot generally be used to impeach other witnesses, the State correctly points out that a defendant's suppressed statements can be

---

19. Defendant asserts that when trial counsel discovered during trial that the arm injury occurred in the United States, rather than in Russia as she had originally thought, she should have asked for a motion to continue or a mistrial. Defendant has made no effort to analyze whether such a request would likely have been successful and, thus, cannot establish that trial counsel's decision not to make such a request was prejudicial to Defendant. *See State v. Kelley*, 2000 UT 41, ¶ 25, 1 P.3d 546 ("To establish prejudice [in an ineffective assistance of counsel claim, the] defendant must show a reasonable probability . . . that except for ineffective counsel, the result would have been different." (omission in original) (internal quotation marks omitted)); *see also State v. Cornejo*, 2006 UT App 215, ¶ 15, 138 P.3d 97 ("The Utah Supreme Court has determined that when a party to a criminal action moves for a continuance in order to procure the testimony of an absent witness, the party must demonstrate that: (1) the testimony sought is material and admissible, (2) the witness could actually be produced, (3) the witness could be produced within a reasonable time, and (4) due diligence ha[d] been exercised before the request for a continuance." (alteration in original) (internal quotation marks omitted)).

used to impeach a defense expert who bases an opinion on the statements made by a defendant. *See Wilkes v. United States*, 631 A.2d 880, 890-91 (D.C. Cir. 1993), *cert. denied*, 115 S. Ct. 143 (1994). We agree with the District of Columbia Court of Appeals, which determined that when a defendant presents an expert opinion that "is based, to any appreciable extent, on statements made to the expert by the defendant," *id.*, the prosecution may use the defendant's statements taken in violation of *Miranda* to challenge that expert's opinion. *See id.* Defendant's statements to police were suppressed because of a *Miranda* violation, not because they were improperly coerced in violation of Defendant's Fifth Amendment rights. Thus, the 23B court correctly ruled that the State could use any statements Defendant made to police to challenge any of the expert's opinions that were based on Defendant's conflicting statements made to the expert. In any event, based on the 23B court's findings, the State's evidence did establish that Defendant's arm was not impaired at the time he assaulted the victim in June 2008. Thus, any error the 23B court made in ruling that Defendant's inconsistent statements could be used against his expert was not prejudicial.

CONCLUSION

¶73 We affirm Defendant's convictions. The State's crisis statement was not improper. Further, Defendant was not prejudiced by the State's punch and future harm statements. Thus, Defendant has failed to establish prosecutorial misconduct under the plain error or ineffective assistance of counsel doctrines. Next, neither Defendant's trial nor post-trial counsel was ineffective for failing to pursue suppression of his statements to police because such statements were not coerced in violation of Defendant's Fifth Amendment rights. Finally, Defendant did not establish that the 23B court's factual determinations were clearly erroneous, and the 23B court was correct in its legal determinations that neither Defendant's trial nor post-trial counsel were ineffective in regard to investigating Defendant's alleged arm injury.

_____
Michele M. Christiansen, Judge

-----

¶74 WE CONCUR:

_____
Carolyn B. McHugh,
Presiding Judge

_____
Gregory K. Orme, Judge