2020 UT App 18

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CULLEN CHRISTOPHER CARRICK,
Appellant.

Opinion
No. 20160249-CA
Filed January 30, 2020

First District Court, Brigham City Department
The Honorable Brandon J. Maynard
No. 141100418

Scott L. Wiggins, Attorney for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE GREGORY K. ORME authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS concurred.

ORME, Judge:

¶1     Appellant Cullen Christopher Carrick challenges his conviction for burglary. He argues that errors by the trial court in denying his motion for a directed verdict, admitting a hearsay statement, and not properly instructing the jury, coupled with various instances of ineffective assistance of counsel, entitle him to reversal and a new trial. We disagree and affirm his conviction.

BACKGROUND[1]

*The Burglary*

¶2    Carrick and a woman (Wife) were involved in an extramarital affair when Wife unexpectedly passed away. Wife's friend (Friend) was privy to the affair and had met Carrick once at Wife's home (the home). Friend had also seen photos of Carrick and shared them with her husband (Friend's Husband). Friend was "[d]isappointed" in Wife for the affair but was still "going to be her best friend." Wife's husband (Husband) learned of the affair just days before Wife's passing when, at the hospital, he stumbled upon romantic messages on social media between Carrick and Wife.

¶3    Undeterred by the potential for a confrontation with Husband, Carrick attended Wife's funeral.[2] Two of Wife's neighbors, neither of whom knew Carrick or about his affair with Wife, saw him at the funeral wearing a distinctive cowboy hat with feathers that "looked like it belonged on a Man From Snowy River."

¶4    After the funeral, the neighbors returned to their home in the "daytime," during the "[a]fternoon." They saw Carrick, wearing the "same hat," walk down the home's driveway, remove a screen from a garage window, and crawl inside. Despite the atypical mode of entry, the neighbors assumed that Carrick had been asked by Husband or Friend to get something

---

1. "On appeal, we recite the facts from the record in the light most favorable to the jury's verdict and present conflicting evidence only as necessary to understand issues raised on appeal." *State v. Daniels*, 2002 UT 2, ¶ 2, 40 P.3d 611.

2. On the day in question, there was a traditional funeral service followed by a balloon release in the parking lot. For ease of reference, we refer to both events collectively as "the funeral."

from the home. They did not call the police but simply proceeded into their own house to retrieve something. When they came back out, they saw Carrick exit through the same window and replace the screen, whereupon they became more suspicious and called the police. They then waved at Carrick, who waved back. They did not see Carrick carrying anything from the home.

¶5    Friend and Friend's Husband soon pulled up in separate vehicles and saw Carrick coming out of the backyard. Friend was "a hundred percent" sure that it was Carrick, and Friend's Husband saw Carrick "briskly" enter into, and then leave in, a silver SUV that was parked just south of the home.

¶6    A police officer (Officer) came to the home, and the neighbors described the suspect to Officer as a "slender guy with long hair" but did not include any mention of the distinctive hat Carrick was wearing. After several people who had gathered at the scene identified Carrick through social media, Officer searched Carrick's name on his computer and obtained an image of Carrick's driver license. He showed it to Friend's Husband and one of the neighbors, and both positively identified Carrick as the person who had entered the home.[3]

¶7    One of the individuals at the scene then called Carrick and handed the phone to Officer. Officer informed Carrick that he was investigating a break-in at the home, that a number of

---

3. Nine days later, Officer took the driver license photo he had initially shown the neighbor back to her and had her initial it. Officer never followed up on Friend's Husband's report that Carrick left in a silver SUV. Officer also had a fingerprint dusting kit in his vehicle but decided against dusting for prints because there were "no obvious fingerprints on the window" and "[i]f there was fingerprints on the screen, there wouldn't be enough . . . of a fingerprint to make an identification."

witnesses had seen him enter and leave the home's garage, and that he wanted Carrick's "side of the story." Carrick said "he was busy" and asked "how important it was" because he was on his way to Salt Lake City. Officer responded that "it was very important" and that if Carrick did not give him an explanation, he "would have to take what [he] had and forward it to the county attorney." In response, Carrick again said he was busy and hung up before Officer could "get his name, date of birth, and personal information."

¶8    Husband then arrived and searched the home to see if anything was missing. Although he noticed that his golf clubs in the garage had been moved, nothing appeared to be missing.

*The Trial*

¶9    The State charged Carrick with one count of burglary, a second-degree felony. In the trial court's opening instructions, in addition to being instructed on burglary, the jury was instructed on the lesser-included offense of criminal trespass. The court also instructed the jury that "[t]he culpable mental state required" to find Carrick guilty of burglary or criminal trespass "is intentionally, or knowingly, or recklessly." The court then defined "knowingly" as being "aware of the nature of [one's] conduct or the existing circumstances" and added that "[a] person acts knowingly . . . with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." The court did not define what it meant for a defendant to act "intentionally" or "recklessly." Before presenting the instructions to the jury, the court asked Carrick's counsel (Trial Counsel) if he had "any objections to the instructions," to which Trial Counsel responded, "No, Your Honor."

¶10    At the close of the State's case-in-chief, in which the State presented the testimony of Officer, the neighbors, Friend, Friend's Husband, and Husband, Trial Counsel moved for a

directed verdict. Trial Counsel argued that "[t]he State has not met their burden" of showing that Carrick "entered or remained unlawfully in a dwelling with the intent to commit a felony or a theft." He also argued, with respect to the lesser-included offense, that even assuming Carrick was in the home, "there has to be a . . . showing that he was reckless as to whether his presence would cause fear for the safety of another" and "[t]here's been no showing of that." The court denied the motion.

¶11    Trial Counsel then presented the testimony of four alibi witnesses: Tanya, Matthew, Elias, and Celeste. In submitting his pre-trial alibi witness list, Trial Counsel represented that the alibi witnesses would testify that "[a]t no time did [Carrick], or any individual in his party, go to the home."

¶12    Tanya, a friend of Wife, testified that she sat with Carrick at the funeral and remained with him until he left when "[i]t was almost dark" and that he "[a]bsolutely" could not have broken into the home. She also testified that at no time during the funeral did he leave and come back because "[h]e didn't have a vehicle."

¶13    Matthew, Wife's co-worker and Carrick's friend, testified that he drove Carrick to and from the funeral. He said the car he drove was a white 2002 Mazda Protege, which he indicated was a five-passenger "car, not an SUV." Matthew testified that Carrick was at the funeral with him "the whole time" and never left. They remained after the funeral "for about an hour or so" and left when "it was getting dark." They made no stops on the way back to his work, where he and Carrick parted ways.

¶14    Elias, a good friend of Carrick's, testified that he and Carrick "hung out in the parking lot and talked" for "quite a while" after the funeral ended. Then, when "it was starting to get dusk," a group, including Carrick, left and met up at Elias's house in Salt Lake City.

¶15    Celeste, Elias's girlfriend and Wife's friend, testified that she sat next to Carrick at the funeral and that they "hung out in the parking lot for around an hour" after the funeral and left when "[i]t was getting to be dark." She never saw him leave before them. She testified that "he hung out with [them]" because he was "emotionally upset." Celeste also testified that "later that night," Carrick and a few others "hung out at [her and Elias's] house."

¶16    On cross-examination, Celeste testified that she received a phone call from Husband, a "day or two" after the funeral, and that he told her "that somebody may have broken into the house the day of the funeral." She denied telling Husband that "Carrick went into the house to get a momento or a token." Celeste testified that she told Husband that it could have been Wife's cousin's son (Cousin) who broke in "because he is known for breaking and entering into their families' homes on the day of funerals." Husband then testified on rebuttal that when he called Celeste, he asked her "why [Carrick] was in the house and what he was looking for." He said she responded that Carrick "was just in there looking for a momento or . . . something sentimental." At this point, Trial Counsel objected on the basis of hearsay. The court overruled the objection, concluding it was "not offered for the truth" but "to impeach what [Celeste] denied."

¶17    Carrick testified in his own defense. He recounted meeting Matthew at Matthew's work and riding with him to the funeral. He acknowledged wearing a feathered cowboy hat at the funeral and that its being characterized as a hat reminiscent of "a Man From Snowy River" was a "fair description." Carrick also testified that he stayed and talked "with a lot of people" in the parking lot for some time after the funeral and that Matthew dropped him off at Matthew's work. He then drove home in his Dodge Caravan, where he switched cars to his father's Kia and drove to Salt Lake City. When asked why witnesses would testify under oath that they saw him enter the home, Carrick responded that it was because "they didn't approve of [his]

relation[ship] with [Wife]" and were apparently willing to perjure themselves to frame him. The jury convicted Carrick of burglary.

*The Appeal and Rule 23B Remand*

¶18 Through new counsel, Carrick appealed. Carrick also filed, pursuant to rule 23B of the Utah Rules of Appellate Procedure, a motion alleging ineffective assistance of counsel and seeking remand to develop "critical facts" regarding Trial Counsel's perceived failures and the resulting prejudice to Carrick.

¶19 Carrick argued that Trial Counsel provided ineffective assistance when he failed to (1) call "an expert witness to testify about the deficiencies and pitfalls of eyewitness identifications"; (2) investigate "the critical failures of Officer . . . to follow standard CSI practices in his investigation of this case"; (3) investigate additional key alibi witnesses who accompanied him during the time the crime allegedly occurred; (4) adequately investigate Cousin, who "should have been a prime suspect" in the burglary; (5) adequately investigate Officer's relationship to one of the neighbors, with whom he was "more than [a] simple acquaintance[]"; and (6) demonstrate at trial that Wife had provided Carrick with the code to the garage door. We denied Carrick's motion as to the alleged failure to call an expert witness because Carrick could not show that Trial Counsel's strategy was unreasonable, *see State v. Walker*, 2010 UT App 157, ¶ 14, 235 P.3d 766, and as to the alleged failure to investigate Officer's "CSI" practices and relationship with one of the witnesses because these assertions relied on speculation, *see State v. Norton*, 2015 UT App 263, ¶ 6, 361 P.3d 719. But we partially granted the motion and remanded for the trial court to take evidence and make findings regarding Trial Counsel's alleged failure to adequately investigate all alibi witnesses and Cousin, as well as Carrick's assertion that he informed Trial Counsel that Wife had given him the garage code, but Trial Counsel failed to use that information at trial.

¶20 On remand the trial court found that Carrick and Trial Counsel discussed alibi witnesses in a meeting during which Trial Counsel "wrote down the names and contact information [Carrick] gave him" and that Carrick "failed to disclose additional alibi witnesses and [Trial Counsel] was not aware of them." The court found, however, that Carrick disclosed to Trial Counsel "that he knew the garage code and would not need to go through the window" had he desired to enter the home.

¶21 Additionally, regarding Cousin being a suspect, Carrick's private investigator testified that Cousin had two burglary convictions from Texas and was of a similar height and build as Carrick but that he was bald whereas Carrick had long hair. The investigator stated that he did not find any photos of Cousin wearing a distinctive hat similar to the one the State's witnesses testified they saw Carrick wearing on the day of the funeral and during the burglary. The court ultimately found that the investigator "did not place [Cousin] at the scene" and that the only connection between Cousin and the burglary was his relation to Wife.

ISSUES AND STANDARDS OF REVIEW

¶22 Carrick argues that the trial court committed three errors. First, he argues that the trial court erred in denying his motion for a directed verdict. "We review a trial court's ruling on a motion for directed verdict for correctness." *State v. Gonzalez*, 2015 UT 10, ¶ 21, 345 P.3d 1168. "In reviewing the denial of a motion for a directed verdict based on a claim of insufficiency of the evidence, we will uphold the trial court's decision if, upon reviewing the evidence and all inferences that can be reasonably drawn from it, we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (quotation simplified).

¶23    Second, Carrick challenges the trial court's ruling admitting what Carrick characterizes as a hearsay statement that established his intent to commit theft. The standard of review for admissibility of hearsay is "complex." *State v. Workman*, 2005 UT 66, ¶ 10, 122 P.3d 639. "We review the legal questions to make the determination of admissibility for correctness, . . . the questions of fact for clear error," and the ultimate "ruling on admissibility for abuse of discretion." *Id.*

¶24    Third, Carrick asserts that the trial court erred when it improperly instructed the jury on the mental states required for both burglary and criminal trespass. "Generally, whether a jury instruction correctly states the law presents a question of law which we review for correctness." *State v. Weaver*, 2005 UT 49, ¶ 6, 122 P.3d 566 (quotation simplified). But Carrick raises this issue as a matter of plain error. "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the trial court; and (iii) the error is harmful, i.e., absent the error, there is a reasonable likelihood of a more favorable outcome for the appellant." *State v. Dean*, 2004 UT 63, ¶ 15, 95 P.3d 276 (quotation simplified). However, if a defendant "affirmatively approved of the jury instructions . . . the invited error doctrine precludes our examining the purported . . . errors under the plain error . . . doctrine." *State v. Malaga*, 2006 UT App 103, ¶ 8, 132 P.3d 703.

¶25    Carrick further contends that Trial Counsel provided ineffective assistance in four respects. First, Carrick contends that Trial Counsel was ineffective for not objecting to the jury instructions' lack of correct definitions for the culpable mental states for burglary and criminal trespass. Second, Carrick asserts that Trial Counsel was ineffective for failing to present evidence to the jury that Wife had provided Carrick with the code to the garage door. Third, Carrick argues that Trial Counsel provided ineffective assistance when he did not investigate additional alibi witnesses. Fourth, Carrick contends that Trial Counsel was ineffective for failing to adequately investigate Cousin as a suspect. Carrick's claims present questions of law that we

consider de novo. *See State v. Kozlov*, 2012 UT App 114, ¶ 29, 276 P.3d 1207. But while "an appellate court is free to make an independent determination of a trial court's conclusions" concerning ineffective assistance of counsel, "the factual findings of the trial court shall not be set aside on appeal unless clearly erroneous." *Id.* (quotation simplified).[4]

## ANALYSIS

### I. Directed Verdict

¶26 Carrick asserts that the trial court erred when it denied his motion for a directed verdict at the close of the State's case because "the record demonstrates a lack of evidence that directly shows, or even supporting an inference reasonably to be drawn from the evidence, that [Carrick]—assuming he had unlawfully entered or remained in the house—intended to commit theft."[5]

---

4. Carrick also argues that the cumulative effect of multiple errors was prejudicial. "A reviewing court will reverse a jury verdict under the cumulative error doctrine only if the cumulative effect of the several errors undermines confidence that a fair trial was had." *State v. Killpack*, 2008 UT 49, ¶ 56, 191 P.3d 17 (quotation simplified). Because we see no error—actual or assumed—that harmed Carrick, much less more than one, there are no errors to cumulate, and the doctrine is inapplicable. *See State v. Martinez-Castellanos*, 2018 UT 46, ¶ 35, 428 P.3d 1038 ("The cumulative error doctrine applies only to errors that could conceivably harm a party in some way. Errors with no potential for harm do not accumulate.").

5. Because Carrick challenges only the sufficiency of the evidence to prove that he had the intent to commit a theft inside the home, we analyze whether there was sufficient evidence to prove this

(continued…)

¶27   Carrick was charged with burglary of a dwelling, and under the facts of this case, the State was required to prove beyond a reasonable doubt that Carrick entered the home with the "intent to commit . . . theft." Utah Code Ann. § 76-6-202(1)(b) (LexisNexis 2017).[6] Because "intent, being a state of mind, is rarely susceptible of direct proof . . . it can be inferred from conduct and attendant circumstances in the light of human behavior and experience." *State v. Hopkins*, 359 P.2d 486, 487 (Utah 1961). *See also State v. Holgate*, 2000 UT 74, ¶ 21, 10 P.3d 346 ("It is well established that intent can be proven by circumstantial evidence.") (quotation simplified). Such circumstantial evidence may include "the manner of entry, the time of day, the character and contents of the building, the person's actions after entry, the totality of the surrounding circumstances, and the intruder's explanation." *State v. Porter*, 705 P.2d 1174, 1177 (Utah 1985).

¶28   In this case, the State presented ample evidence to warrant submitting the case to the jury so that it could decide whether Carrick intended to commit a theft once inside the home. First, Carrick was having an affair with Wife, of which Husband was unaware until just before Wife's passing. Second, Carrick was at the funeral where he was "emotionally upset" and witnessed Husband superintending the funeral proceedings. Third, witnesses placed Carrick at the home after the funeral and saw him remove a screen from a garage window, crawl through it, and then leave through the same window instead of a door, which one with permission to enter would likely have used once

---

(…continued)
element of the crime—not whether there was sufficient evidence to establish that he entered the home, which there was.

6. Because the statutory provisions in effect at the relevant time do not differ in any way material to our analysis from those now in effect, we cite the current version of the Utah Code for convenience.

he gained entry into the locked home. Witnesses also saw Carrick leave the home "briskly" and enter a waiting vehicle. Thus, the jury could have properly "inferred from [Carrick's] conduct and attendant circumstances in the light of human behavior and experience," *Hopkins*, 359 P.2d at 487, that because of Carrick's affair with Wife, he may have wanted to enter the home—which he had visited on at least one prior occasion—to obtain something of sentimental value by which to remember Wife. A reasonable jury could also properly infer from this evidence that he used the time immediately after the funeral to go into the home, knowing Husband would not be present, so that he could complete the theft undetected. Furthermore, his mode of entry and exit was consistent with that of an individual who intended to commit a theft in the home. *Cf. State v. Robertson*, 2005 UT App 419, ¶ 16, 122 P.3d 895 (holding that a jury could reasonably infer the defendant intended to commit a theft because he "entered the home through a window after prying off a window screen," the defendant did not have permission to be in the home, and the defendant "fled the scene and provided no explanation for his actions").

¶29    Ultimately, the State presented at least "some evidence . . . from which a reasonable jury could find that the element[] [of intent to commit a theft] had been proven beyond a reasonable doubt."[7] *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183

---

7. Carrick relies on the fact that "[n]one of the State's witnesses . . . provided any testimony that [he] had been seen carrying anything from the house" to support his position that the State "fail[ed] to produce believable evidence of all the elements of Burglary beyond a reasonable doubt." But this point is irrelevant because the crime of burglary "is complete when the entry is made with the intent. Whether anything is stolen or not has nothing to do with the crime." *State v. Facer*, 552 P.2d 110, 111 (Utah 1976). Although Carrick was not seen carrying anything and Husband did not notice anything missing, this does not necessarily mean that Carrick did not enter with the intent to

(continued…)

(quotation simplified). Therefore, the trial court did not err; it was "the trial court's duty to submit the case to the jury."[8] *Id.* ¶ 33 (quotation simplified).

## II. Hearsay

¶30 Carrick asserts that the trial court erred in overruling his hearsay objection to Husband's testimony that Celeste told him that Carrick was in the home "looking for a momento or . . . something sentimental." Hearsay is an out-of-court statement offered "to prove the truth of the matter asserted in the statement," Utah R. Evid. 801(c), and is ordinarily inadmissible at trial, *id.* R. 802. Statements that are not considered hearsay include those in which "[t]he declarant testifies and is subject to cross-examination about a prior statement, and the statement . . . is inconsistent with the declarant's testimony or the declarant denies having made the statement or has forgotten." *Id.* R. 801(d)(1)(A). Extrinsic evidence of prior inconsistent statements "is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires." *Id.* R. 613(b).

¶31 On cross-examination, the State asked Celeste whether it was "true that [she] told [Husband] that . . . Carrick went into

---

(…continued)

steal something. Carrick could have stolen something small (such as jewelry, a picture, or a note) and put it in his pocket.

8. Carrick also argues that the trial court erred in denying his directed verdict motion regarding the lesser-included offense of criminal trespass. But because the jury convicted him of burglary, and the court did not err in denying Carrick's directed verdict motion as to that charge, we have no need to discuss whether there was also sufficient evidence to convict Carrick of the lesser-included offense of criminal trespass.

the house to get a momento or a token." Celeste conceded that she spoke with Husband "[a] day or two" after the funeral but denied telling Husband that Carrick went into the home. Carrick then had an opportunity for redirect examination, which he took, but decided to question Celeste only about another issue that arose during the State's cross-examination of her. The State then called Husband to testify in rebuttal. Husband testified that when he called Celeste, he asked her "why [Carrick] was in [the] house and what he was looking for," and she responded that "[Carrick] was just in there looking for a momento or . . . something sentimental." Under rule 801(d), Husband's rebuttal testimony about what Celeste told him was not hearsay because he was testifying about a prior inconsistent statement made by Celeste that she "denie[d] having made." *Id.* R. 801(d)(1)(A). Celeste was "given an opportunity to explain or deny the statement," and Carrick was "given an opportunity to examine [Celeste] about it." *Id.* R. 613(b).

¶32     Carrick, however, argues that Husband's testimony was hearsay because the State "substantively used the statement for its truth [during closing argument]." But Carrick makes no attempt to explain how the statement was not admissible as a prior inconsistent statement under rule 801(d) in the first place, which we conclude it was. The trial court's admission of the statement at the time it was offered was consistent with rule 801(d), and we reject Carrick's assertion that the State's use during closing argument of Husband's testimony regarding Celeste's statement to him somehow retroactively rendered the statement hearsay. If Carrick had a problem with how the State used the statement during closing argument, Carrick should have objected at that time, which he did not, and he does not now claim Trial Counsel was ineffective for failing to object. In any event, the State's use of the prior inconsistent statement for its truth during closing argument would not have rendered the testimony inadmissible. Although the trial court overruled Carrick's objection on the ground that Husband's testimony was "not offered for the truth" but "to impeach what [Celeste] denied," prior inconsistent statements are statements that do not

qualify as hearsay and generally may be used for their truth. *See State v. Zaelit*, 2010 UT App 208U, para. 4 (holding that prior inconsistent statements are not limited to impeachment and may be used as "'*substantive evidence*'") (quoting Utah R. Evid. 801 advisory committee note) (emphasis in original). *See also* R. Collin Mangrum & Dee Benson, *Mangrum & Benson on Utah Evidence* 824 (2018–2019 ed.) ("[U]nder the Utah rule a prior inconsistent statement is admissible to prove the truth of the matter asserted.").

### III. Plain Error

¶33    Carrick argues that the trial court plainly erred in not providing correct definitional instructions to the jury on the culpable mental states for the charges of burglary and criminal trespass. The State contends that Carrick's plain error argument is not available to him because Carrick invited any error made by the trial court in instructing the jury. We agree with the State.

¶34    "Under the doctrine of invited error, an error is invited when counsel encourages the trial court to make an erroneous ruling." *State v. McNeil*, 2016 UT 3, ¶ 17, 365 P.3d 699. This "rule discourages parties from intentionally misleading the trial court so as to preserve a hidden ground for reversal on appeal and gives the trial court the first opportunity to address the claim of error." *Id.* (quotation simplified). "Thus, when an error is invited by an appellant, we will not review it even for plain error." *State v. Oliver*, 2018 UT App 101, ¶ 27, 427 P.3d 495. "To invite an error, a party must do more than simply fail to object; the party must manifest some sort of affirmative representation to the trial court that the court is proceeding appropriately." *State v. Popp*, 2019 UT App 173, ¶ 23, 453 P.3d 657. "In the context of jury instructions, our supreme court has held that an instruction is not subject even to plain error review if counsel, in response to a question from the court about whether counsel has any objection to the instruction, answers in the negative." *Id.* (quotation simplified). *See also State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111 (holding that appellate review is unavailable "if counsel,

either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction").

¶35 In this case, before presenting the jury with the instructions, the trial court asked Trial Counsel if he had "any objections to the instructions," to which Trial Counsel responded, "No, Your Honor." Thus, because Trial Counsel made "an affirmative representation encouraging the court to proceed without further consideration of [the jury instructions]," thus inviting any resulting error, we "need not consider [Carrick's] objection" to those instructions under the plain error doctrine. *State v. Moa*, 2012 UT 28, ¶ 27, 282 P.3d 985. *See State v. Geukgeuzian*, 2004 UT 16, ¶ 10, 86 P.3d 742 ("[A] defendant invite[s] error where his counsel confirm[s] on the record that the defense ha[s] no objection to the instructions given by the trial court.").

## IV. Ineffective Assistance of Counsel

¶36 Carrick next contends that Trial Counsel rendered ineffective assistance in four respects: first, by not objecting to the lack of definitions for the culpable mental states of burglary and criminal trespass; second, by not presenting evidence to the jury that Wife had provided Carrick with the code to the garage door; third, by not investigating additional alibi witnesses; and fourth, by failing to adequately investigate Cousin as a potential suspect.

¶37 The standard a defendant must meet in order to gain relief for ineffective assistance of counsel is a familiar one, and was recently summarized as follows:

> To prove a claim of ineffective assistance of counsel, a defendant must establish both that his counsel's performance was deficient and that the deficient performance prejudiced the defense. To establish the first element, the defendant must show that his counsel's performance fell below an

objective standard of reasonableness. Thus, he must convince us that, despite the fact that counsel is strongly presumed to have rendered adequate assistance, counsel's acts or omissions nevertheless fell outside the wide range of professionally competent assistance. The second element requires the defendant to show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. In evaluating this element, courts consider the totality of the evidence before the judge or jury, recognizing that some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect.

Proof of ineffective assistance of counsel cannot be a speculative matter but must be a demonstrable reality. Both elements of the claim must be present, and if either is lacking, the claim fails and the court need not address the other.

*State v. Lopez-Gonzalez*, 2020 UT App 15, ¶¶ 19–20 (quotation simplified).

A.    Jury Instructions

¶38    Carrick contends that Trial Counsel was ineffective for not objecting to the jury instructions. He argues that the instructions were "wholly insufficient" because they did not define "intent" (the culpable mental state for burglary), *see* Utah Code Ann. § 76-6-202(1) (LexisNexis 2017), or "reckless" (the culpable mental state for criminal trespass), *see id.* § 76-6-206(2)(a)(iii), while instead defining only "knowingly." While we are admittedly perplexed that the trial court provided

the definition of an irrelevant mental state, and not the mental states at issue, we do not agree that Trial Counsel rendered ineffective assistance by not objecting, because Carrick has not shown prejudice.

¶39 Here, had Trial Counsel objected to the jury instructions for their lack of definitions for the applicable mental states, prompting the trial court to give the statutory definition of intent, it is not reasonably probable that the verdict would have been different.[9] Under the Utah Code, intentional conduct is defined as acting "[i]ntentionally, or with intent or willfully with respect to the nature of his conduct or to a result of his conduct, when it is his conscious objective or desire to engage in the conduct or cause the result." Utah Code Ann. § 76-2-103(1) (LexisNexis 2017). This definition comports with the plain meaning of the word intent. *See, e.g.*, Webster's Third New International Dictionary 1176 (1993) (defining "intent" as "the design or purpose to commit" an "act that is the natural and probable consequence of other voluntary acts or conduct"). Thus, even if the jury had been provided the statutory definition of intent, there is not a reasonable probability that it would have viewed Carrick's actions in entering and exiting the home any differently than it did because the statutory definition simply reiterated the common meaning of the word, which we assume was within the jury's knowledge. *See People v. Powell*, 512 N.E.2d 1364, 1370 (Ill. App. Ct. 1987) (holding that the trial court did not err in failing to define "knowingly and intentionally because those terms have a plain meaning within the jury's common knowledge"). This is especially so because the State presented a substantial amount of evidence indicating that Carrick had a

___

9. We do not address Carrick's claim regarding criminal trespass. The jury convicted him of burglary, and as explained in the text, he suffered no prejudice attributable to definitional confusion on that conviction. Thus, there is no need for us to address Carrick's claim regarding criminal trespass, a charge on which he was not convicted.

"conscious objective or desire," *see* Utah Code Ann.
§ 76-2-103(1), to enter the home to commit theft. Furthermore,
the State argued its case in a manner consistent with the
statutory definition of intent. In its opening statement, the State
argued that Carrick "went into [the home] for the purposes of
retrieving something." Then, in its closing argument, the State
argued that Carrick did not go into the home "[t]o look around
and smile [or] look in the mirror and see how good he looked"
but "to find something and to retrieve it because he wanted it."
The State continued, "[Y]ou can infer from the fact that he went
into that house, you can infer from the motives that are likely
that, in fact, he was in there to find something." Thus, the
evidence was presented to the jury in a manner consistent with
the statutory definition of intent, and the jurors would in all
reasonable probability have reached the same result had they
been instructed in accordance with the statutory definition of
intent. Carrick's claim of ineffective assistance of counsel is
therefore unavailing, because he has not shown prejudice.

B. Garage Passcode

¶40 Carrick asserts that he received ineffective assistance
when Trial Counsel failed to present evidence that Carrick knew
the passcode to the garage and therefore had no need to enter
the home through a window to the attached garage. Carrick
argues that he was prejudiced by this failure because evidence
that Wife gave him the passcode to the garage "directly
contradicted the possibility that he would have entered the
home through the garage window," thereby creating a
reasonable probability of acquittal. We disagree. Even assuming
Trial Counsel performed deficiently in this regard, the claim fails
because Carrick has not shown prejudice.

¶41 Two neighbors saw Carrick at the funeral wearing a
distinctive cowboy hat with feathers that "looked like it
belonged on a Man From Snowy River," and then when they
returned home they saw Carrick, still wearing that distinctive
hat, crawl into and out of the garage through the window.

Additionally, Friend (who had previously met Carrick in person) and Friend's Husband saw Carrick coming out of the backyard of the home. Thus, the jury heard from four witnesses who placed Carrick at the scene in the "daytime," during the "afternoon," with no significant obstacles to obstruct their view. Moreover, Carrick's mere knowledge of the garage code does not compel the conclusion that he could not possibly have entered through the window. Even with knowledge of the code,[10] he may have still entered through the window thinking it was more covert than having the large garage door open up for all to see. Or he may have figured that not using the code would deflect attention from him, setting up the very argument he now makes, namely that it could not be him because he would not have gone in through the garage window because he had the code. These possibilities dispel the conclusion that, but for Trial Counsel not introducing evidence that Carrick knew the code, there is a reasonable probability the jury would have acquitted him. And mere knowledge of the code does not, as Carrick contends, "directly contradict[]" the ample eyewitness testimony that he entered through the garage window. Ultimately, Carrick cannot show that it is "a demonstrable reality and not a speculative matter," *see State v. Nelson*, 2015 UT 62, ¶ 10, 355 P.3d 1031 (quotation simplified), "that there is a reasonable probability that . . . the result of the proceeding would have been different" had the jury heard that he knew the passcode to the garage, *see Strickland v. Washington*, 466 U.S. 668, 694 (1984).

C.    Alibi Witnesses

¶42    Carrick contends that Trial Counsel was ineffective for failing to investigate additional alibi witnesses. On remand, the trial court found that Carrick never told Trial Counsel about

---

10. Curiously, despite his oft-repeated claim to have known the code, Carrick never disclosed the code's numerical sequence in support of this claim.

these additional witnesses, and Carrick has not shown this finding to be clearly erroneous.

¶43    But the fact that Carrick did not inform Trial Counsel of the additional alibi witnesses does not automatically establish that Trial Counsel's performance was not deficient. Whether or not their clients inform them of alibi witnesses, counsel are still required "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Menzies v. State*, 2014 UT 40, ¶ 183, 344 P.3d 581 (quotation simplified). But "[t]he Sixth Amendment does *not* require counsel to interview every possible relative or acquaintance or to fully investigate every potential lead." *Id.* (emphasis in original).

¶44    Here, Trial Counsel acted reasonably in presenting four solid alibi witnesses at trial, whom he and Carrick did discuss. Trial Counsel was therefore not remiss in forgoing an investigation of the possible existence of other, cumulative alibi witnesses whom Carrick had not mentioned. *See State v. Rasabout*, 2013 UT App 71, ¶¶ 43, 46, 299 P.3d 625 (holding that counsel's failure to further investigate alibi witnesses was not deficient performance when defendant "never informed his counsel of the two witnesses who could corroborate his alibi" and "counsel inquired about potential witnesses and was given only one lead"), *aff'd*, 2015 UT 72, 356 P.3d 1258.

D.    Investigation of Cousin

¶45    Carrick's claim that Trial Counsel provided ineffective assistance by not adequately investigating Cousin as a potential suspect is also unpersuasive because Carrick has not demonstrated prejudice.

¶46    The trial court found that Cousin was bald, while Carrick had long hair; Carrick's private investigator did not place Cousin at the scene, while four witnesses placed Carrick at the scene. Furthermore, there was no evidence that Cousin wore a

distinctive, feathered cowboy hat, while multiple witnesses testified to seeing Carrick wearing one at the funeral and at the home. Indeed, nothing in the record indicates that Cousin was even in the area that day, while it is undisputed that Carrick attended the funeral.

¶47 Assuming, without deciding, that Trial Counsel was remiss for not investigating Cousin, the trial court's findings demonstrate that even if Trial Counsel had done so, he would not have uncovered evidence that would have given rise to "a reasonable probability" of a different outcome at trial. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).


CONCLUSION

¶48 Carrick's three claims of trial court error are unavailing. The trial court did not err in denying Carrick's directed verdict motion because there was sufficient evidence for the case to be submitted to the jury. The court also did not err in overruling his hearsay objection because the complained-of statement was properly admitted as a prior inconsistent statement. Finally, because Carrick invited any error with respect to the jury instructions on the culpable mental states for burglary and criminal trespass, we do not consider his claim that the trial court plainly erred in giving these instructions.

¶49 Carrick's argument that he received ineffective assistance of counsel in four respects is likewise unavailing. Carrick's contention that Trial Counsel was ineffective for (1) failing to object to the trial court not instructing the jury on the culpable mental states for burglary and criminal trespass, (2) not presenting evidence that he knew the passcode to the garage door, and (3) not investigating Cousin as a potential suspect are unavailing due to a lack of demonstrated prejudice. Furthermore, Carrick's claim that Trial Counsel was ineffective for failing to investigate additional alibi witnesses is unsuccessful because Trial Counsel's performance was not

deficient in this regard. Trial Counsel presented four alibi witnesses at trial, and Carrick never informed him of the additional witnesses.

¶50    Affirmed.

———————